ITALIAN COWBOY PARTNERS,
LTD., Francesco Secchi and
Jane Secchi, Petitioners,

v.

The PRUDENTIAL INSURANCE COM-
PANY OF AMERICA and Four Part-
ners, LLC d/b/a Prizm Partners and
d/b/a United Commercial Property
Services, Respondents.

No. 08–0989.

Supreme Court of Texas.

Argued April 14, 2010.

Decided April 15, 2011.

Luke Madole, Thomas Fenton Allen Jr., Carrington Coleman Sloman & Blumenthal, Ricardo Rochetti, Charles Josef Blanchard, Carrington Coleman Sloman & Blumenthal, Dallas, TX, for Italian Cowboy Partners, Ltd.

G. Luke Ashley, John A. Mackintosh Jr., Richard Barrett Phillips, Jr., Thompson & Knight, L.L.P., Dallas, TX, for The Prudential Insurance Company of America.

Justice GREEN delivered the opinion of the Court in which Chief Justice JEFFERSON, Justice WAINWRIGHT, Justice MEDINA, Justice JOHNSON, and Justice LEHRMANN joined.

We recognized decades ago that agreeing to a merger clause does not waive the right to sue for fraud should a party later discover that the representations it relied upon before signing the contract were fraudulent. *See Dallas Farm Mach. Co. v. Reaves,* 158 Tex. 1, 307 S.W.2d 233, 239 (1957) (quoting *Bates v. Southgate,* 308 Mass. 170, 31 N.E.2d 551, 558 (1941)). The principal issue in this case is whether disclaimer-of-representations language within a lease contract amounts to a standard merger clause, or also disclaims reliance on representations, thus negating an element of the petitioner's claim for fraud-

ulent inducement of that contract. We conclude that the contract language in this case does not disclaim reliance or bar a claim based on fraudulent inducement. Accordingly, we reverse the take-nothing judgment of the court of appeals and remand the case to that court for further proceedings consistent with this opinion. We render judgment in favor of the lessee on its claim for rescission premised on breach of the implied warranty of suitability.

## I. Facts

This dispute arose when Jane and Francesco Secchi, owners and operators of a restaurant, Italian Cowboy, terminated the restaurant's lease because of a persistent sewer gas odor.[1] In a suit against the landlord, Prudential Insurance Company of America, and the property manager, Prizm Partners,[2] the Secchis sought to rescind the lease and recover damages for fraud and breach of the implied warranty of suitability. The landlord maintains that rescission is not warranted and seeks to recover for breach of contract.

The Secchis successfully owned and operated restaurants for more than twenty years. The Secchis identified Keystone Park, a Dallas shopping center owned by Prudential and managed by Prizm, as a possible site for a new restaurant, Italian Cowboy. Keystone Park housed three successful restaurants and had a vacant restaurant building available for lease. The Secchis began negotiating a potential lease of the vacant restaurant building with Prizm's property management director, Fran Powell.

During the lease negotiations, Powell told the Secchis that the building was practically new and had no problems. In particular, Francesco Secchi testified that Powell told him "the building was in perfect condition, never a problem whatsoever." According to Secchi, Powell also said, "[T]his is my baby and I was here from the first day when they put the first brick until the last one. The size—it's in perfect condition. There is no problem whatsoever.... [It is] a perfect building." Similarly, Jane Secchi testified that Powell told her that "this was a very new building and she had been present at the very beginning of this building and watched it all the way through," that "[i]t was somewhat of her baby," and that "there had been nothing wrong with the place at all."

The lease with Italian Cowboy contained the following relevant provisions:

14.18 *Representations.* Tenant acknowledges that neither Landlord nor Landlord's agents, employees or contractors have made any representations or promises with respect to the Site, the Shopping Center or this Lease except as expressly set forth herein.

14.21 *Entire Agreement.* This lease constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, and no subsequent amendment or agreement shall be binding upon either party unless it is signed by each party....

---

1. The lease was executed by Italian Cowboy Partners, Ltd., but the Secchis also signed a personal guaranty. In their individual capacities, the Secchis later filed suit to rescind the guaranty. We include the Secchis' individual claims in our references to the claims filed by Italian Cowboy Partners, Ltd., as the claims and the facts giving rise to them are, in relevant respects, the same.

2. We refer to the respondents collectively as Prudential. Prudential does not dispute that Prizm or Prizm's property manager, Fran Powell, acted as its agent during the lease negotiations and in managing the property under the Italian Cowboy lease.

The Secchis began remodeling the property after signing the lease. During this time, the Secchis first heard that a severe odor had plagued Hudson's Grill, the previous tenant. Francesco Secchi testified that a nearby cinema manager had asked Ron Perry, Italian Cowboy's general contractor, if he knew of the problematic odor existing in the previous restaurant. Secchi stated that a few days later, "[a] guy with a motorcycle" stopped by the restaurant and said to "be very careful.... [There] used to be a place called Hudson's here and they used to serve excellent hamburgers, but there was a very, very bad odor."

Upon hearing these statements, Francesco Secchi contacted Powell and specifically asked whether Hudson's Grill had experienced an odor problem. According to Secchi, Powell answered that she had been working with the building "all the time," and that "[n]ever before" had there been a problem—this was the "first time" she heard something was wrong.

The sewer system subsequently backed up during the remodeling, and Francesco Secchi again contacted Powell. Secchi complained to Powell that there was an odor coming from several parts of the building. According to Secchi, Powell replied that she did not "know anything" about these issues. As renovations proceeded, the odor subsided.

However, a persistent odor—distinct from the earlier odor—materialized a few months later, a week before the planned "soft opening" of the Italian Cowboy restaurant. A cleanup crew removed a layer of hardened grease that had been blocking the inlet pipe to the grease trap, and a constant foul sewer gas odor became evident immediately. Francesco Secchi then contacted Powell again because "the odor started to come inside ... the restaurant" from the grease trap, which was located outside the restaurant building. Secchi

told Powell they had a big problem, and he testified that on that day, Powell acknowledged that she smelled the odor, though she never admitted the same problem had occurred with Hudson's Grill.

Attempts to remedy the persistent sewer gas odor began immediately and continued for months. Perry and Powell inspected the plumbing and seals for leaks. Powell contacted Prizm's plumbers, Twin Cities, who replaced toilet rings in a restroom, and Powell authorized Perry to take out a wall, which Perry did. Perry then capped off a sink arm in the kitchen, Twin Cities installed new roof vents, and Powell and Perry examined parts along the bathroom wall corridor. The Secchis hired a trusted repair man, who "put [in] some extra pipes [to extend the sewer vents] to maybe get the odor out." Powell also had camera tests of the plumbing lines conducted. Twin Cities attempted to correct the outflow lines running between the grease trap and the city's sewer system. The Secchis hired Lawton Mechanical Contractors, who continued efforts to remedy the odor by focusing on the grease trap, including its seals and covers. All of these attempts were unsuccessful.

In hopes that the foul odor would soon be remedied, the Secchis opened Italian Cowboy. The odor persisted, however, and the restaurant was unable to draw customers. At one point, the City of Dallas briefly shut down the restaurant following a customer's complaint to the health department. Secchi again complained about the odor to Powell, stating that "this is a very big problem.... You cannot operate a restaurant with an odor like that."

Secchi contacted Powell again later and told her that "the odor was so terrible" that Italian Cowboy "couldn't carry on." Powell then arranged for a smoke test to help identify the odor's source. After the

test, Secchi asked Powell if those conducting the test had found anything and "[s]he said no." Yet, Secchi testified that one of the men who conducted the test said, "I found three [smoke] bombs, but those, they're old bombs. They're not our bombs. Those had been put some time ago."

Throughout this time, Powell continually denied knowledge of previous odor problems. However, the Secchis soon learned from a former manager of Hudson's Grill, Darla Wahl, and her husband, who had also worked at the restaurant, that the sewer gas odor was not only present during Hudson's tenancy and that attempts to remedy it at the time were also unsuccessful, but that Powell was aware of the odor at that time and had visited Hudson's Grill numerous times while the odor was present. Wahl testified that on the day of her and her husband's visit to Italian Cowboy as patrons, she "came back from the restroom and told [her husband] the smell is still there in the bathrooms," and she confirmed the smell was noticeable "outside the restroom area" as well. Wahl mentioned the odor to one of the servers, at which point "Jane [Secchi] came over to the bar area and introduced herself" to the Wahls. Wahl then told Secchi that "the smell was there while I was at the restaurant when it was Hudson's Grill" and that Powell had been "present in the restaurant when the smell was there." Wahl confirmed she spoke with Secchi regarding "how long the smell had been there," "whether customers had complained about it," "how often customers complained about it," and the things that were done "to try to alleviate the smell."

Upon receiving this information from the Wahls, the Secchis immediately ceased paying rent and closed the restaurant. Italian Cowboy then sued Prudential and Prizm, asserting claims for fraud, including both a theory of fraud in the inducement of the lease, as well as fraud based on later misrepresentations. Italian Cowboy further asserted claims for negligent misrepresentation, breach of the implied warranty of suitability, and constructive eviction, and also sought rescission of the lease.

At trial, Matt Quinn, who had been regional manager of Hudson's Grill, directly refuted Powell's representations, testifying that he recalled incidents of sewer gas odor in Hudson's Grill and that Powell "knew of the smell," that "she talked to myself about it and other people about it as well," and that she described it as "almost unbearable" and "ungodly." When late on a rent payment, Quinn said, "I told her we had a problem with an odor coming from the bathroom and that's what was causing a lot of problems as far as business. . . . Obviously no business, no sales, no sales can't pay the rent." Also, after the initiation of the dispute, Powell contacted Quinn in reference to the odor, and he informed her that they "never did get it . . . taken care of." Quinn also testified that Prizm's president, Scott Weaver, had experienced the odor while visiting Hudson's Grill, and knew that Hudson's Grill had been unsuccessful in attempting to remedy it. Darla Wahl affirmed at trial what she had told the Secchis just before Italian Cowboy closed. Powell, on the other hand, continued to deny any knowledge of, or experience with, the odor during the Hudson's Grill tenancy.

The trial court found for Italian Cowboy on all claims. The trial court entered findings of fact, including:

- "Through her on-site visits to Hudson's Grill, Powell learned of the sewer gas smell in Hudson's Grill, of measures taken to remedy the odor, and that such measures were unsuccessful." Specifically, Powell was at Hudson's Grill "while the smell was present [and] per-

sonally characterized it as 'horrid' and 'ungodly'; a smell that would make one 'gag.'"

- During negotiations, Powell described the building as "her baby" and "purported to have, and did have, knowledge superior to the Secchis of what had transpired in and about the Premises when it served as the Hudson's Grill and what would transpire in the future concerning the Premises and Keystone Park."

- Powell's statements—"[t]he Secchis were lucky to be able to lease the [building] because the building ... was practically new and was problem-free; [n]o problems had been experienced with the [building] by the prior tenant; [t]he building ... was a perfect restaurant site"—were statements of fact, known to be false when made, and were relied upon by the Secchis in signing the lease and guaranty.

- "Powell's conduct and attempted cover-up when the Hudson's Grill sewer gas smell recurred in the Italian Cowboy restaurant evidenced consciousness of guilt of her pre-lease and pre-guaranty misrepresentations to the Secchis."

Italian Cowboy elected to rescind the lease, and to recover damages for rescission.[3] The trial court awarded $600,070.40 in actual damages, plus prejudgment interest and attorney's fees. The trial court awarded $50,000 as exemplary damages. The trial court also ordered that Prudential take nothing on its counterclaim for breach of contract. The court of appeals, however, reversed as to each of Italian Cowboy's claims and rendered a take-nothing judgment, while rendering judgment in favor of Prudential on its counterclaim for breach of contract. 270 S.W.3d at 208.

We granted Italian Cowboy's petition for review. 53 Tex.Sup.Ct.J. 389 (Mar. 15, 2010).

## II. Disclaimer of Reliance and Fraudulent Inducement

■ We turn first to whether the lease contract effectively disclaims reliance on representations made by Prudential, negating an element of Italian Cowboy's fraud claim. We conclude that it does not. First, a plain reading of the contract language at issue indicates that the parties' intent was merely to include the substance of a standard merger clause, which does not disclaim reliance. Moreover, even if the parties had intended to disclaim reliance, the contract provisions do not do so by clear and unequivocal language. For these reasons, we hold as a matter of law that the language contained in the lease agreement at issue does not negate the reliance element of Italian Cowboy's fraud claim.

■ A contract is subject to avoidance on the ground of fraudulent inducement. *Williams v. Glash,* 789 S.W.2d 261, 264 (Tex.1990); RESTATEMENT (SECOND) OF CONTRACTS § 214 cmt. c (1981) ("What appears to be a complete and binding integrated agreement ... may be voidable for fraud...."). For more than fifty years, it has been "the rule that a written contract [even] containing a merger clause can [nevertheless] be avoided for antecedent fraud or fraud in its inducement and that the parol evidence rule does not stand in the way of proof of such fraud." *Dallas Farm Mach. Co. v. Reaves,* 158 Tex. 1, 307 S.W.2d 233, 239 (1957) (citing *Bates v. Southgate,* 308 Mass. 170, 31 N.E.2d 551,

---

3. As discussed below in Part IV, testimony from the subsequent restaurant tenant indicated that the persistent odor disappeared after that tenant severed wastewater piping to the grease trap, moved the kitchen to a new area of the building, raised vent stacks, and re-routed pipes on the roof.

558 (1941)); *accord* RESTATEMENT (SECOND) OF CONTRACTS § 214 cmt. c (1981) ("Such invalidating causes [including fraud] need not and commonly do not appear on the face of the writing. They are not affected even by a 'merger' clause."). In *Reaves*, we quoted approvingly the "sound public policy" supporting the rule on merger clauses:

> The same public policy that in general sanctions the avoidance of a promise obtained by deceit strikes down all attempts to circumvent that policy by means of contractual devices. In the realm of fact it is entirely possible for a party knowingly to agree that no representations have been made to him, while at the same time believing and relying upon representations which in fact have been made and in fact are false but for which he would not have made the agreement. To deny this possibility is to ignore the frequent instances in everyday experience where parties accept, often without critical examination, and act upon agreements containing somewhere within their four corners exculpatory clauses in one form or another, but where they do so, nevertheless, in reliance upon the honesty of supposed friends, the plausible and disarming statements of salesmen, or the customary course of business. To refuse relief would result in opening the door to a multitude of frauds and in thwarting the general policy of the law.

307 S.W.2d at 239 (quoting *Bates*, 31 N.E.2d at 558).

Decades later, we recognized an exception to this rule in *Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997), and held that when sophisticated parties represented by counsel disclaim reliance on representations about a specific matter in dispute, such a disclaimer may be binding, conclusively negating the element of reliance in a suit for fraudulent inducement.[4] *Id.* at 179. In other words, fraudulent inducement is almost always grounds to set aside a contract despite a merger clause, but in certain circumstances, it may be possible for a contract's terms to preclude a claim for fraudulent inducement by a clear and specific disclaimer-of-reliance clause. *See id.* We stated that we had a clear desire to protect parties from unintentionally waiving a claim for fraud, but also identified "a competing concern—the ability of parties to fully and finally resolve disputes between them." *Id.* We held that "[p]arties should be able to bargain for and execute a release[5] barring all further dispute," and to that end, "parties may disclaim reliance on representations[, a]nd such a disclaimer, where the parties' intent is clear and specific, should be effective to negate a fraudulent inducement claim." *Id.; see also* TEX. CIV. PRAC. & REM.CODE § 154.002 ("It is the policy of this state to encourage the peaceable resolution of disputes ... and the early settlement of pending litigation through voluntary settlement procedures."). Schlumberger and the Swansons had long been embroiled in a dispute over the feasibility of a mining project, and

---

4. We also held in *Schlumberger* that parties can execute "a release that clearly expresses the parties' intent to waive fraudulent inducement claims." 959 S.W.2d at 181. Here, however, Prudential does not argue this lease expressly disclaims a fraudulent inducement claim, and instead suggests that a disclaimer of representations amounts to a disclaimer of reliance upon such representations.

5. "Texas law favors and encourages voluntary settlements and orderly dispute resolution. However, a release is a contract, and like any other contract, is subject to avoidance on grounds such as fraud or mistake." *Schlumberger*, 959 S.W.2d at 178.

were "attempting to put an end to their deal." *Schlumberger,* 959 S.W.2d at 180. Given the circumstances surrounding the settlement agreement's formation, we determined that the disclaimer-of-reliance clause had the "requisite clear and unequivocal expression of intent necessary to disclaim reliance ... on specific representations by Schlumberger," and thus the clause effectively precluded a claim for fraudulent inducement. *Id.* at 179–80.

More recently, in *Forest Oil Corp. v. McAllen,* 268 S.W.3d 51 (Tex.2008), we applied our *Schlumberger* analysis to a settlement agreement that was intended to resolve both future and past claims. *Id.* at 58 ("Our analysis in *Schlumberger* rested on the paramount principle that Texas courts should uphold contracts negotiated at arm's length by knowledgeable and sophisticated business players represented by highly competent and able legal counsel, a principle that applies with equal force to contracts that reserve future claims as to contracts that settle all claims." (internal quotations omitted)). In *Forest Oil,* we held that "a freely negotiated agreement to settle present disputes and arbitrate future ones" was enforceable. *Id.* We acknowledged that "[a]n all-embracing disclaimer of any and all representations, as here, shows the parties' clear intent." *Id.* We also reemphasized the strong policy favoring settlement agreements. *Id.* at 60. ("Refusing to honor a settlement agreement—an agreement highly favored by the law—under these facts would invite unfortunate consequences for the everyday business transactions and the efficient settlement of disputes." (footnote omitted)). Despite applying *Schlumberger*'s analysis to a more inclusive settlement agreement, we were careful to clarify that:

> Today's holding should not be construed to mean that mere disclaimer standing alone will forgive intentional lies regard-

less of context. We decline to adopt a *per se* rule that a disclaimer automatically precludes a fraudulent-inducement claim, but we hold today, as in *Schlumberger,* that "on this record," the disclaimer of reliance refutes the required element of reliance.

*Id.* at 61.

■ Here, the parties dispute whether a disclaimer of reliance exists, or whether the lease provisions simply amount to a merger clause, which would not disclaim reliance. The question of whether an adequate disclaimer of reliance exists is a matter of law. *See Schlumberger,* 959 S.W.2d at 181. Our analysis of the parties' intent in this case begins with the typical rules of contract construction.

■ In construing a contract, a court must ascertain the true intentions of the parties as expressed in the writing itself. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003). In identifying such intent, "we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* We begin this analysis with the contract's express language. *Progressive County Mut. Ins. Co. v. Kelley,* 284 S.W.3d 805, 807 (Tex.2009) (per curiam); *see also Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983) ("If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law."). "[I]f the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent." *J.M. Davidson,* 128 S.W.3d at 229. "Only where a contract is ambiguous may a court consider the parties' inter-

pretation and admit extraneous evidence to determine the true meaning of the instrument." *David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 450–51 (Tex.2008) (per curiam) (internal quotation omitted).

Prudential focuses our attention on section 14.18 of the lease contract (*"Representations "*), suggesting that Italian Cowboy's fraud claim is barred by its agreement that Prudential did not make any representations outside the agreement, i.e., that Italian Cowboy impliedly agreed not to rely on any external representations by agreeing that no external representations were made. Standard merger clauses, however, often contain language indicating that no representations were made other than those contained in the contract, without speaking to reliance at all. *See, e.g.,* RESTATEMENT (SECOND) OF CONTRACTS § 216 cmt. e (1981) (discussing merger clauses and observing that "[w]ritten agreements often contain clauses stating that there are no representations, promises or agreements between the parties except those found in the writing. Such a clause ... is likely to conclude the issue whether the agreement is completely integrated.").[6] Such language achieves the purpose of ensuring that the contract at issue invalidates or supersedes any previous agreements, as well as negating the apparent authority of an agent to later modify the contract's terms. *See* RESTATEMENT (SECOND)

OF CONTRACTS § 216 cmt. e (1981) (observing that a merger clause "may negate the apparent authority of an agent to vary orally the written terms"); 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 33.21 (4th ed.1999) (stating that the existence of a merger clause showing the parties' intent to fully integrate their contract requires application of the parol evidence rule, which renders prior agreements covering the same subject matter unenforceable).

We conclude that the only reasonable interpretation of the contract language at issue here is that the parties to this lease intended nothing more than the provisions of a standard merger clause, and did not intend to include a disclaimer of reliance on representations. Therefore, we need not consider any extraneous evidence of the parties' intent to ascertain the true meaning of the instrument. *See Sacks,* 266 S.W.3d at 450–51.

Pure merger clauses, without an expressed *clear and unequivocal intent to* disclaim reliance or waive claims for fraudulent inducement, have never had the effect of precluding claims for fraudulent inducement. *See, e.g., Reaves,* 307 S.W.2d at 239; *Edward Thompson Co. v. Sawyers,* 111 Tex. 374, 234 S.W. 873, 873–75 (1921) (holding that a buyer of legal encyclopedias could sue the seller for fraudulent in-

---

**6.** *See also* 7 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 28.21 (rev. ed.2002) (describing merger clauses as "stating that the writing contains the entire contract and that no representations other than those contained in the writing have been made"); 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 33.21 (4th ed. 1999) ("Recitations to the effect that a written contract is integrated, that all conditions, promises, or representations are contained in the writing ... are commonly known as merger or integration clauses."); *see also, e.g., Tellepsen Builders, L.P. v. Kendall/Heaton Assocs., Inc.,* 325

S.W.3d 692, 699 (Tex.App.-Houston [1st Dist.] 2010, pet. denied) ("The subcontracts at issue included merger clauses, stating that each subcontract represented the entire agreement and superseded all prior negotiations, representations and agreements, either written or oral."); *Va. Power Energy Mktg., Inc. v. Apache Corp.,* 297 S.W.3d 397, 406 (Tex.App.-Houston [14th Dist.] 2009, pet. denied) (quoting a merger clause stating that "any prior contracts, understandings and representations, whether oral or written, relating to such transaction are merged into and superseded by this Contract").

ducement based on oral representations despite a contract clause stating that no representations or guaranties had been made that were not expressed in the contract); RESTATEMENT (SECOND) OF CONTRACTS § 214 cmt. c. (1981); 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 33.21 (4th ed. 1999) ("The better view is ... to ask whether a fraudulent misrepresentation (as opposed to, say, a warranty) has been made and whether the party asserting the fraud would have entered the agreement had he or she known the representation was false; if not, the contract should be voidable to the same extent as if there were no merger clause and, indeed, as if there were no writing....."); see also Vigortone AG Prods., Inc. v. PM AG Prods., Inc., 316 F.3d 641, 644 (7th Cir.2002) (Posner, J.) ("[A]ll an integration clause does is limit the evidence available to the parties should a dispute arise over the meaning of the contract. It has nothing to do with whether the contract was induced ... by fraud.").

The language of the contract at issue here differs significantly from the provisions at issue in Schlumberger and Forest Oil, where we determined there was an intent to disclaim reliance. In Schlumberger, the contract provided, "[N]one of us is relying upon any statement or representation of any agent of the parties being released hereby. Each of us is relying on his or her own judgment...." 959 S.W.2d at 180 (emphasis omitted). Similarly, in Forest Oil, the contract stated that "in executing the releases contained in this Agreement, [the parties are not] relying upon any statement or representation of any agent of the parties being released hereby. [We are] relying on [our] own judgment...." 268 S.W.3d at 54 n. 4. In each case, the intent to disclaim reliance on others' representations—that is, to rely only on one's own judgment—was evident

from the language of the contract itself. No such intent is evident in Italian Cowboy's lease contract, which provided only that "neither Landlord nor Landlord's agents, employees or contractors have made any representations or promises with respect to the Site, the Shopping Center or this Lease except as expressly set forth herein," and that "this lease constitutes the entire agreement between the parties hereto with respect to the subject matter hereof." There is a significant difference between a party disclaiming its *reliance* on certain representations, and therefore potentially relinquishing the right to pursue any claim for which reliance is an element, and disclaiming the *fact* that no other representations were made. In addition to differences in the contract's language, the facts surrounding this lease agreement differ significantly from those in Schlumberger and Forest Oil, where we could more easily determine that the parties intended once and for all to resolve specific disputes. See Forest Oil, 268 S.W.3d at 60 (concerning a release containing an arbitration requirement for future disputes); Schlumberger, 959 S.W.2d at 179–80 (concerning a once-and-for-all settlement agreement over a seafloor mining operation by which parties attempted to put an end to their dispute). A lease agreement, as here, which is the initiation of a business relationship, should be all the more clear and unequivocal in effectively disclaiming reliance and precluding a claim for fraudulent inducement, lest we "forgive intentional lies regardless of context." Forest Oil, 268 S.W.3d at 61.

Here, the only plain reading of the contract language in sections 14.18 and 14.21 is that the parties intended to include a well-recognized merger clause. Nothing in that language suggests that the parties intended to disclaim reliance. Prudential and the dissent would have us hold that

parties no longer have to disclose known defects if they include a general merger clause in the lease agreement. This is outside a well-settled body of law on the proper legal effect of merger clauses and represents unsound policy.[7] *See* 7 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 28.21 (rev. ed. 2002) ("Despite the existence of a merger clause, parol evidence is admissible for purposes of demonstrating that the agreement is void or voidable or for proving an action for deceit. *Fraus omnia corrumpit:* fraud vitiates everything it touches." (footnote omitted)); *see also Morris v. House*, 32 Tex. 492, 495 (1870) ("[I]t is properly said that fraud vitiates whatever it touches."); *cf. Reaves*, 307 S.W.2d at 239 (discussing the "sound public policy" behind allowing parties an action for fraud despite a contract's efforts to eliminate its availability).

We have repeatedly held that to disclaim reliance, parties must use clear and unequivocal language. *See Forest Oil*, 268 S.W.3d at 62; *Schlumberger*, 959 S.W.2d at 179–80. This elevated requirement of precise language helps ensure that parties to a contract—even sophisticated parties represented by able attorneys—understand that the contract's terms disclaim reliance, such that the contract may be binding even if it was induced by fraud. Here, the contract language was not clear or unequivocal about disclaiming reliance. For instance, the term "rely" does not appear in any form, either in terms of relying on the other party's representations, or in relying solely on one's own judgment. This provision stands in stark contrast to provisions we have previously held were clear and unequivocal:

| *Schlumberger* | *Forest Oil* | *Italian Cowboy* |
| --- | --- | --- |
| [E]ach of us . . . expressly warrants and represents . . . that no promise or agreement which is not herein expressed has been made to him or her in executing this release, and that none of us is *relying* upon any statement or representation of any agent of the parties being released hereby. Each of us is *relying* on his or her own judgment. . . . | [We] expressly represent and warrant . . . that no promise or agreement which is not herein expressed has been made to them in executing the releases contained in this Agreement, and that they are not *relying* upon any statement or representation of any of the parties being released hereby. [We] are *relying* upon [our] own judgment. . . . | Tenant acknowledges that neither Landlord nor Landlord's agents, employees or contractors have made any representations or promises . . . except as expressly set forth herein. |

*Forest Oil*, 268 S.W.3d at 54 (emphasis added); *Schlumberger*, 959 S.W.2d at 180 (emphasis added).

We decline to extend our holdings in *Schlumberger* and *Forest Oil*—each of which included clear and unequivocal language expressly disclaiming reliance on

representations, and representing reliance on one's own judgment—to the generic merger language contained in the contract at issue in this case. As a matter of law, the lease agreement at issue does not disclaim reliance, and thus does not defeat Italian Cowboy's claim for fraudulent in-

---

7. We realize we may have suggested otherwise in certain language in *Schlumberger*. *See* 959 S.W.2d at 181 ("We emphasize that a disclaimer of reliance *or merger clause* will not always bar a fraudulent inducement

claim." (emphasis added)). Today, we expressly hold that a merger clause—as distinct from a specific disclaimer-of-reliance clause— may not, by itself, bar an action to set aside a contract based on fraudulent inducement.

ducement.[8]

### III. Fraud and Negligent Misrepresentation

 Because the court of appeals concluded that a binding disclaimer of reliance existed, it did not reach the merits of Italian Cowboy's fraud claims. However, Prudential asserts alternate bases for why Italian Cowboy's fraud claims fail as a matter of law. The elements of fraud are:

(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

*Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex.2009) (per curiam). We review legal questions that rest on a factual basis de novo, while affording deference to the trial court's findings of fact. *See Reliance Nat'l Indem. Co. v. Advance'd Temps., Inc.*, 227 S.W.3d 46, 50 (Tex.2007) ("Appellate courts review legal determinations de novo, whereas factual determinations receive more deferential review based on the sufficiency of the evidence.").

Prudential maintains that Italian Cowboy's fraud claims fail as a matter of law because either Powell's representations were statements of opinion (undercutting the first element), or were not known to be false (undercutting the third element). We disagree. We conclude that her statements were actionable material misrepresentations as a matter of law, and that legally sufficient evidence established that those misrepresentations were known to be false when made.

The trial court listed in its findings of fact three actionable representations made during the lease negotiations:

a. The Secchis were lucky to be able to lease the Premises because the building on the Premises was practically new and was problem-free;

b. No problems had been experienced with the Premises by the prior tenant; [and]

c. The building on the Premises was a perfect restaurant site and that the Secchis could get into the building as a restaurant site for next to nothing.

 "Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *Smith v. KNC Optical, Inc.*, 296 S.W.3d 807, 812 (Tex. App.-Dallas 2009, no pet.). Pure expressions of opinion are not representations of

---

8. Were this a clear and unequivocal disclaimer-of-reliance clause, our analysis would then proceed to "the circumstances surrounding [the contract's] formation," in order to determine whether such a provision is binding on the parties involved. *Schlumberger*, 959 S.W.2d at 179. This would include an analysis of whether "the terms of the contract were negotiated, rather than boilerplate;" during negotiations "the parties specifically discussed the issue which [became] the topic of the subsequent dispute;" "the complaining party was represented by counsel;" "the par-

ties dealt with each other in an arm's length transaction;" and "the parties were knowledgeable in business matters." *Forest Oil*, 268 S.W.3d at 60 (discussing the most important factors from *Schlumberger* to consider in enforcing a disclaimer-of-reliance clause). We also observed that if the situation, like that in *Schlumberger*, indicates a "once and for all" settlement of claims, this "may constitute an additional factor urging rejection of fraud-based claims." *Id.* at 58 (emphasis omitted).

material fact, and thus cannot provide a basis for a fraud claim. *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 163 (Tex.1995). "Whether a statement is an actionable statement of 'fact' or merely one of 'opinion' often depends on the circumstances in which a statement is made." *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex.1995). Special or one-sided knowledge may help lead to the conclusion that a statement is one of fact, not opinion. *See id.* (including "the comparative levels of the speaker's and the hearer's knowledge" as among the relevant circumstances upon which the classification of a statement as fact or opinion depends). Moreover, even if an expression is an opinion, "[t]here are exceptions to this general rule that an expression of an opinion cannot support an action for fraud." *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983). One such exception is that "when an opinion is based on past or present facts . . . . special knowledge establishes a basis for fraud." *Id.* Thus, most simply, "[s]uperior knowledge by one party may also provide the occasion for fraud."[9] *Faircloth*, 898 S.W.2d at 277; *see also Matis v. Golden*, 228 S.W.3d 301, 307 (Tex.App.-Waco 2007, no pet.) ("When a speaker purports to have special knowledge of the facts, or does have superior knowledge of the facts—for example, when the facts underlying the opinion are not equally available to both parties—a party may maintain a fraud action." (quoting *Paull v. Capital Res. Mgmt., Inc.*, 987 S.W.2d 214, 219 (Tex.App.-Austin 1999, pet. denied))); *Padgett v. Bert Ogden Motor's, Inc.*, 869

S.W.2d 532, 535–36 (Tex.App.-Corpus Christi 1993, writ denied) (concluding statements were actionable representations of fact where body shop employees had "specifically inspected and determined how best to repair [a purchaser's] car" and subsequently represented that the car was "completely repaired" and "completely fixed," even though they only partially repaired the car's frame).

Initially, it defies common sense and any plausible meaning of the word "problem" to infer from the first two representations that in Prudential's "opinion," the sewer gas odor was not a problem for Hudson's Grill. A foul odor is obviously problematic to a restaurant.[10] Testimony indicated that Powell herself personally experienced the odor and described it as "almost unbearable" and "ungodly." According to its regional manager, Hudson's Grill had even indicated to Powell that it was late in making rent payments because of the odor. In light of the circumstances, we conclude that the statements concealing the odor "problem" are more properly statements of fact, not pure expressions of opinion. *Cf. GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 889–90 (Tex.App.-Austin 2008, no pet.) (determining vehicle seller's statements that he had "no problems [whatsoever]" to be a factual representation where "an inspection revealed structurally unsafe engine frames, corrosion, and serious engine problems"); *Padgett*, 869 S.W.2d at 535–36. Similarly, because of the attempts to remedy the odor by Hudson's Grill, known by Powell, combined with testimony that

---

9. However one analyzes it, the ultimate question is whether the statement is actionable as fraud. The result may be the same where, as here, special or one-sided knowledge helps one categorize a statement as fact rather than opinion, or instead triggers the exception that even a pure opinion is actionable because of special knowledge.

10. As the trial court wrote in its findings of fact, "[a]s a matter of lay testimony and common sense, recurring unresolved sewer gas odors in a restaurant are a material fact to someone leasing for restaurant use."

the odor was not remedied before Hudson's Grill closed, Powell's statement that the restaurant site was "perfect" is better characterized as a false statement of fact. *Cf. GJP, Inc.*, 251 S.W.3d at 889–90 (determining statements that the vehicle was "in fine running order" and that it had "strong mechanicals" to be factual representations).

■ Even assuming, however, that Powell's statements are properly considered pure expressions of opinion, Prudential's one-sided knowledge of past facts makes these particular representations actionable under the circumstances. *See Faircloth*, 898 S.W.2d at 277; *Trenholm*, 646 S.W.2d at 930. Powell emphasized to Italian Cowboy that she had been working with the restaurant site since its inception, implying that she had personal knowledge of its entire history from her experience— i.e., if there had been something worth mentioning, she would have known about it and mentioned it. Powell's honest representations about her superior knowledge of the site—such as stating that she "was here from the first day when they put the first brick until the last one"—were so intertwined with her other statements that they are actionable. *See Trenholm*, 646 S.W.2d at 931 ("These are direct representations of present facts which are so intertwined with his future prediction that the whole statement amounts to a representation of facts."); *Matis*, 228 S.W.3d at 307. The persistent odor problem did not appear until a layer of solidified grease was removed from the grease trap, meaning that a reasonable inspection of the premises by Italian Cowboy would not have revealed the problem. Thus, Italian Cowboy did not have access to the same information as Powell.

■ While it is true that Italian Cowboy could have interviewed the former tenant to inquire about prior problems with the property, we are unwilling to require prospective commercial tenants to undertake this burden simply to ensure that they can later bring claims arising from their reliance on representations about the property made by a lessor with superior, personal knowledge. Rather, commercial tenants are entitled to rely on the fact that a landlord will not actively conceal material information. Firsthand knowledge— like Powell's—concerning material information—like an odor problem in a restaurant site—is exactly the sort of scenario that demonstrates the sound policy behind the exception allowing an opinion to be actionable under certain circumstances where material information was withheld.

Prudential also suggests that because the odor played no role in Hudson's Grill's decision to close, Powell had no knowledge of her statements' falsity, i.e., that "Powell had no reason to think that there was any significant 'problem' with the Premises." Even if Powell intended her statement to be limited in this sense, testimony from Hudson's regional manager indicated that he had told Powell that Hudson's Grill was having difficulties paying rent because of the odor problem in the restaurant. Moreover, Powell's representations went far beyond simply stating that she knew of no problems that caused Hudson's Grill to close. Testimony showed that Powell knew about the odor from personal experience and that the odor problem was never resolved. Thus, even when considering the context of Powell's statements, it follows that her actionable representations implicated Powell in knowing that her statements were false when made.

We conclude that as a matter of law, Powell's representations were actionable, and legally sufficient evidence existed to demonstrate that they were known to be false when made. Because the court of appeals concluded that Italian Cowboy dis-

claimed reliance, it never reached Prudential's argument as to the factual sufficiency of the evidence supporting Italian Cowboy's fraud claims. Accordingly, having decided that there is no alternative legal basis to render judgment in favor of Prudential on Italian Cowboy's fraud claims, we remand the case to the court of appeals for further consideration.[11]

## IV. Breach of the Implied Warranty of Suitability

 Prudential next disputes whether the trial court erred in rendering judgment on Italian Cowboy's claim for breach of the implied warranty of suitability, arguing that this claim fails as a matter of law. In a commercial lease, the lessor makes an implied warranty that the premises are suitable for the intended commercial purposes. *Davidow v. Inwood N. Prof'l Group—Phase I,* 747 S.W.2d 373, 377 (Tex.1988). Specifically, a lessor impliedly warrants that at the inception of the lease, no latent defects exist that are vital to the use of the premises for their intended commercial purpose. *Id.* Moreover, a lessor is responsible for ensuring that "essential facilities will remain in a suitable condition." *Id.* Thus, to establish a breach of this warranty, a lessee must show that a latent defect in the facilities existed at the inception of the lease, that the facilities were vital to the use of the premises for the intended purposes, and

that the lessor failed to repair the defect.[12] *See id.* However, if "the parties to a lease expressly agree that the tenant will repair certain defects, then the provisions of the lease will control." *Id.; see also Gym-N-I Playgrounds, Inc., v. Snider,* 220 S.W.3d 905, 914 & n. 1 (Tex.2007) (holding that the implied warranty of suitability was disclaimed by an agreement providing that the landlord made no express or implied warranties regarding "fitness or suitability for a particular purpose or otherwise" and that "any implied warranties are expressly disclaimed and excluded"). Thus, by accepting responsibility to repair certain defects, a lessee relieves the lessor from liability for breach of the implied warranty of suitability as to those defects. *See Davidow,* 747 S.W.2d at 377. We must begin, then, by interpreting the lease contract at issue to determine the extent to which it relieved the lessor from liability for the implied warranty of suitability.

Here, Italian Cowboy did not expressly waive the implied warranty of suitability. However, it did accept responsibility to make certain repairs that might otherwise have run to Prudential as a result of the implied warranty of suitability. The parties dispute whether Italian Cowboy's responsibilities under the lease included repairs to the particular defect in the premises—the sewer gas odor, or its cause. Thus, there are two parts to this inquiry: first, what was the defect; and

11. Although we affirm the trial court's award of actual damages on an alternative basis— breach of the implied warranty of suitability— as discussed below, only Italian Cowboy's fraud claim gives rise to punitive damages, which the trial court also awarded, and which Prudential continues to dispute. Thus, resolution by the court of appeals of whether factually sufficient evidence supports liability for fraud is a necessary predicate to determining whether punitive damages may be proper. *See* Tex. Civ. Prac. & Rem.Code § 41.003(c) (allowing recovery of punitive damages for

fraud if actual knowledge is further established by clear and convincing evidence).

12. We offer no opinion as to whether an action may exist for harm resulting from a latent defect during the period of time before a landlord successfully repairs a defect. Here, there is no dispute that the defect was not remedied—and no evidence suggested it would likely be remedied any time soon— when Italian Cowboy closed and sued Prudential.

second, whether the lease allocated the responsibility to repair that defect to Italian Cowboy.

■■■ As to the first part of this inquiry, concerning a latent defect in the premises, we observe that "[t]he existence of a breach of the implied warranty of suitability in commercial leases is usually a fact question to be determined from the particular circumstances of each case." *Id.* While Italian Cowboy characterizes the defect as the presence of the odor itself, we agree with Prudential that the proper analysis of the defect in this particular case must inquire into the cause of the odor because this is the condition of the premises covered by the duty to repair. Thus, we examine first the trial court's findings of fact as to the causes of the odor, and whether such findings are supported by legally sufficient evidence.

Italian Cowboy offered uncontroverted evidence that a grease trap had been improperly installed, causing raw sewage to back up from the sewer lines. Indeed, testimony indicated that the persistent odor problem emerged when the inlet to the grease trap was opened months into Italian Cowboy's renovations. Moreover, testimony indicated that after the subsequent tenant leased the restaurant space, it severed the wastewater piping to the grease trap and moved the kitchen area to a new part of the building, blocking off the old wastewater system entirely and eliminating the odor. This evidence is legally sufficient to support the trial court's finding of fact that "the facilities producing the sewer gas odor ... included the grease interceptor in the Common Areas adjacent to the Premises, [and] the waste-water and sanitary sewer utility lines in the Common Areas adjacent to the Premises." Prudential also offered uncontroverted evidence that a roof drain line had been misrouted, as well as that a sewer gas line was

"hooked up at the wrong line going to the roof," and that after correcting these errors, along with raising vent stacks on the roof, the subsequent tenant experienced no further odor. This evidence is legally sufficient to support the trial court's finding that the sewer gas odor was also produced by "communication of the odors [from the grease trap and sewer lines] via structural components and via the utility lines or systems serving and within the Premises which ultimately had to be altered (not just repaired) to arrest the sewer gas odor." In other words, the trial court concluded, by legally sufficient evidence, that several items—the grease trap, the plumbing lines and system, and the ventilation lines and system—caused the odor, either independently or in conjunction, because each was defective.

Our analysis turns next to whether under the lease contract, as a matter of law, Italian Cowboy assumed responsibility to repair each defect, relieving Prudential from liability for a breach of the implied warranty of suitability based on each defect. The contract provides in relevant part:

- 1.1 *"Common Areas"*—[Defined as] [t]hose areas, facilities, utilities, improvements, equipment and installations in the Shopping Center which are provided, or which may be designated by the Landlord, for the nonexclusive use or benefit of Landlord and tenants of the "Shopping Center," their employees, agents, customers, licensees and invitees, including but not limited to the parking areas, driveways, entrance/exitways, sidewalks, landscaped areas, water, gas (if available), electric, storm and sanitary sewer lines and appurtenant equipment.
- 5.1 *Alterations by Tenant.* Tenant shall not make any exterior or structural alterations to (including but not

limited to alterations to the Premises exterior, or signs and/or utility lines or systems within or serving the Premises) without Landlord's prior consent. . . .

- 5.2 *Repairs by Landlord and Tenant.* Landlord shall make all repairs to the Common Areas adjacent to the Premises (other than the Premises and its perimeter sidewalks) as part of its obligation to maintain the Common Areas. Landlord shall also be responsible for repairs to structural components of the Premises (other than the roof). Tenant shall, at its expense, be responsible for all repairs to the interior and non-structural components of the Premises, including but not limited to the exterior and interior of the Premises and its perimeter sidewalks, whether structural or non-structural, foreseen or unforeseen, including but not limited to the storefront and all interior and exterior doors and plate glass, and all electrical, plumbing, heating, ventilating, air conditioning, sprinkler systems, and any other mechanical installations or equipment serving the Premises or located therein, whether or not in or under the floor slab or on the roof of the Premises. The duty to repair shall include the duty to replace, to the extent necessary. . . . Tenant shall also be responsible for regular cleaning of all grease traps and maintaining them in a safe condition. . . .

We observe at the outset that these provisions are in tension with one another, at one point allocating responsibility for repairs to the "water . . . storm and sanitary sewer lines and appurtenant equipment" to Prudential, while at another point allocating responsibility for repairs to the "plumbing . . . and ventilating" systems and "mechanical installations or equipment serving the Premises" to Italian Cowboy. We also observe, however, that while Italian Cowboy may have assumed at least some duty to repair, it was at the same time expressly precluded from making alterations to utility lines or systems without consent. Although the court of appeals did not discuss it, the trial court credited this distinction, finding the fact that "structural components and . . . utility lines or systems serving and within the Premises . . . ultimately had to be altered (not just repaired) to arrest the sewer gas odor." More specifically, the trial court found that the particular work done by the subsequent tenant that finally arrested the sewer gas odor problem qualified as "alterations" to the facilities described in section 5.1 of the lease.

The contract distinguishes between repairs and alterations, without defining the terms, and principles of contract interpretation require us to give effect to these distinctions; harmonizing their use in a meaningful way. *See J.M. Davidson, Inc.,* 128 S.W.3d at 229 ("[W]e must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."). To harmonize the repair and alteration provisions, the terms must refer to different categories of work that vary according to the work's character or extent. The trial court thus impliedly found that the work in question was of a character, or to a significant enough extent, that the work constituted an alteration. Indeed, the trial court was in the best position to consider the evidence as to the character and extent of the work done by the subsequent tenant.

Because of the character and significant extent of the completed work that ultimately eliminated the odor, we agree that an alteration was needed as the term is

used in section 5.1 of this particular contract, going beyond a repair as used in section 5.2. It was not the case that the sewer gas exhaust line on the roof was damaged and needed to be fixed. The problem was that the sewer gas exhaust line was working exactly as it was supposed to, as were components of the ventilation system, which had been placed near the sewer gas exhaust pipe. This suggests that the work was more than a repair to fix a broken system. Had a pipe become broken, it would have been Italian Cowboy's responsibility to patch it or replace it. But since the piping system had to be entirely rerouted, and vent stacks raised, Prudential was responsible for such alterations because Italian Cowboy was precluded from doing such work by section 5.1 without consent.[13] Likewise, the subsequent tenant severed the existing wastewater piping system and moved the kitchen to a new area of the building, abandoning the former grease trap. Again, such work amounts to more than a mere repair of broken equipment.[14]

Moreover, under section 5.2, Prudential had the express obligation to "maintain" the common areas, including the sanitary sewer lines and appurtenant equipment. Evidence showed that certain defects—essentially, a defective design—existed from the moment of the sewer system's installation, as it interacted with the grease trap and ventilation system. Thus, the responsibility for the work done to resolve the defects properly falls under Prudential's duty to maintain a working sewer system, not Italian Cowboy's responsibility to repair a previously working sewer system. The responsibility to maintain a system must contemplate the installation of a functional system in the first place; the responsibility to repair does not properly include the responsibility to completely rework a system that was structurally defective. Prudential, then, was also responsible under its lease with Italian Cowboy for the work to remedy the defect because the responsibility to maintain sewer lines and equipment fell to Prudential under section 5.2.

Thus, we conclude that Prudential was not relieved by the contract from liability for breach of the implied warranty of suitability as to a latent defect in facilities that were vital to Italian Cowboy's use of the premises as a restaurant. Accordingly, we reverse the judgment of the court of appeals as to this claim. Moreover, because Prudential did not challenge the factual sufficiency of the evidence supporting any of the trial court's findings of fact on this issue in the court of appeals, and because the evidence supporting such findings is legally sufficient, we render judgment in favor of Italian Cowboy as to this claim.

 Prudential asserts that even if rescission might have been proper at some point, Italian Cowboy ratified the lease by continuing in the lease for a period of time after having knowledge of the defect. However, even were we to consider ratification as a defense to breach of the implied warranty of suitability,[15] Italian Cow-

13. This work was performed by the subsequent tenant. Any questions of who was responsible for such work under that tenant's lease are not before us.

14. Although we interpret the contract's provisions as a matter of law, we note that a plumber who attempted at various times to remedy Italian Cowboy's odor problem described the work done by the subsequent tenant as "structural alterations" at trial.

15. Prudential offers this argument as a defense to a claim for rescission based on unilateral or mutual mistake—a claim that we do not reach. However, inasmuch as ratification has been a defense to rescission more generally, we consider it here as it relates to all of Italian Cowboy's claims upon which rescis-

boy's actions in this case could not give rise to ratification. Texas law requires only that one rescind within a reasonable time from discovering the grounds for rescission. *Reagan & Co. v. Tabor,* 540 S.W.2d 575, 576 (Tex.Civ.App.-Waco 1976, writ ref'd n.r.e.) ("[A] party is not required to exercise his right to rescind 'as soon as' he discovers grounds therefor, but only within a reasonable time."). Ratification by failure to act with reasonable promptness is an affirmative defense, with the burden upon the party asserting it. *See Crown Eng'g v. Grissom,* 343 S.W.2d 330, 332 (Tex.Civ.App.-Waco 1961, writ dism'd) ("The fact that the party seeking rescission failed to act with reasonable promptness after discovery of the facts, constitutes a waiver of his right to a rescission, and is an affirmative defense which must be pleaded and proven by the party asserting same." (emphasis omitted)) (citing Tex.R. Civ. P. 90, which lists affirmative defenses including "waiver, and any other matter constituting an avoidance"). "Time is material so far only as, when associated with other circumstances, [rescission] may produce injury or unjust consequences to the defendant or third persons." *Vandervoort v. Sansom,* 293 S.W.2d 271, 275 (Tex. Civ.App.-Fort Worth 1956, writ ref'd n.r.e.) (discussing rescission and ratification in the context of fraudulent inducement).

Here, Prudential has failed to establish ratification. Foremost, it points to no way in which it was injured or suffered unjust consequences by Italian Cowboy's temporary efforts alongside Prudential to remedy the odor. *See id.* Moreover, Prudential has not established that Italian Cowboy waited an unreasonable length of time to terminate the lease. The latent defect was not yet remedied—indeed, the underlying cause(s) of the odor remained unknown—when Italian Cowboy closed and stopped paying rent, only a few weeks after the persistent odor materialized.[16] According to the Secchis' testimony, such a remedy did not seem likely, if even possible, at that time. Were we to find the attempts made here to remedy the defect sufficient to foreclose the possibility of rescission because of ratification, similarly-situated commercial tenants would be placed in the difficult position of being pushed to abandon a lease at the first sign of any trouble, so as to avoid potentially being trapped in a lease of property containing a defect rendering it unsuitable for commercial purposes. This is unsound policy; we must allow a balance between making initial attempts to diagnose and remedy a premises defect while preserving the right to rescind a lease if such attempts are unsuccessful. Thus, we conclude that under the facts of this case, Prudential has not established that Italian Cowboy's remaining in occupancy, while both parties made unsuccessful attempts to remedy the odor, gives rise to ratification of the lease contract after Italian Cowboy acquired knowledge of the defect.

 The trial court awarded both rescission of the lease and damages to restore Italian Cowboy to the position it would have been in absent Prudential's breach of warranty. Rescission of a commercial lease is indeed a proper remedy for breach of the implied warranty of suit-

sion could be premised, without deciding whether ratification might be available as a defense against one asserting only a claim for breach of the implied warranty of suitability.

**16.** We observe that Prudential here conflates separate incidents of odor problems during the course of Italian Cowboy's tenancy, despite the testimony that Italian Cowboy's initial odor problems, during the early part of its renovations, were separate from the persistent sewer gas odor problem that materialized upon opening of the grease trap.

ability, as are such damages. *See Davidow*, 747 S.W.2d at 377 (stating that because a landlord breached the implied warranty of suitability, the tenant "was therefore justified in abandoning the premises and discontinuing his rent payments"); *accord Gober v. Wright*, 838 S.W.2d 794, 798–99 (Tex.App.-Houston [1st Dist.] 1992, writ denied) ("[W]e upheld the jury's finding that the premises were unsuitable for their intended commercial purposes after June 2, 1988. This finding relieved lessees from their obligation to pay any rent after that date."), *abrogated on other grounds by State Farm Fire & Cas. Co. v. Morua*, 979 S.W.2d 616 (Tex.1998). Accordingly, because rescission is proper, we need not consider further Italian Cowboy's remaining claims for negligent misrepresentation, constructive eviction, or rescission based on mistake, inasmuch as they afford no opportunity for greater recovery. We turn next, however, to the issues that Prudential raises as to the amount of actual damages awarded by the trial court in light of rescission being a proper remedy for Prudential's breach of the implied warranty of suitability.

### V. Damages

For its actual damages calculation, the trial court added the amount of capital Italian Cowboy's investors contributed, including interest ("interest carry") that the investors would have earned on that investment, as well as the debt Italian Cowboy incurred, then subtracted the value of the remaining assets that Italian Cowboy acquired, to reach a sum of $600,070.40. Prudential asserts that the actual damages award for loss of capital investment is an award of special damages that is unsupported because such damages were never pled, and because such an amount is unsupported by legally sufficient evidence.[17] We review Prudential's arguments as to the pleading requirement and legal sufficiency in turn.

"Rescission is an equitable remedy and, as a general rule, the measure of damage is the return of the consideration paid, together with such further special damage or expense as may have been reasonably incurred by the party wronged on account of the contract." *Smith v. Nat'l Resort Cmtys., Inc.*, 585 S.W.2d 655, 660 (Tex.1979). Under Texas Rule of Civil Procedure 56, "[w]hen items of special damage are claimed, they shall be specifically stated." However, Texas Rule of Civil Procedure 90 states:

> Every defect, omission or fault in a pleading either of form or of substance, which is not specifically pointed out by exception in writing and brought to the attention of the judge in the trial court ... in a non-jury case, before the judgment is signed, shall be deemed to have been waived by the party seeking reversal on such account....

Here, Prudential never filed a special exception in writing, and only filed written objections after the judgment was signed. Indeed, the only oral objection during trial that Prudential directs us to concerned testimony on lost profits, not lost investment, at which point the trial court allowed continued testimony on the damages data from both Jane Secchi and Italian Cowboy's expert. A party is not required to specially except to a pleading defect if it lacks notice of the other party's intent. *See Estate of Stonecipher v. Estate of*

---

17. We note that most of Prudential's briefing on this point speaks to the factual sufficiency of the evidence, which we may not review, not the legal sufficiency. *See* Tex. Const. art.

V, § 6(a) ("[T]he decision of ... courts [of appeals] shall be conclusive on all questions of fact brought before them on appeal or error.").

*Butts,* 686 S.W.2d 101, 103 (Tex.1985) (holding that where "intent to seek other causes of action was clear on the face of his petition," and no special exceptions or other contests were made to the petition as to such a defect, the other party "waived this point of error"); *Roark v. Allen,* 633 S.W.2d 804, 810 (Tex.1982) ("A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense."). Here, however, the trial court had conducted a hearing more than a year and a half before trial regarding the admissibility of Italian Cowboy's expert's testimony including lost investment damages, and ruled that the expert could testify. Thus, under Rule 90, having notice of the specific damages Italian Cowboy intended to seek, Prudential waived its argument as to the inclusion of lost investment damages in the trial court's award by failing to specially except in writing to any pleading defect. *See* TEX.R. CIV. P. 90; *Roark,* 633 S.W.2d at 810 ("If Dr. Matthews considered the petition obscure, he should have specially excepted to it and he has waived any defect by his failure to do so."). We need not consider whether Italian Cowboy's pleading was defective in this regard.

■ Prudential next challenges the legal sufficiency of the evidence that its breach of warranty caused the special damages of Italian Cowboy. When rescission of a lease is appropriate for breach of the implied warranty of suitability, a tenant is entitled to be restored to the position it would have been in had it not leased the premises that turned out to contain a latent defect rendering the premises commercially unsuitable. *See Smith,* 585 S.W.2d at 660 (discussing how rescission is an equitable remedy that should accompany "such further special damage or expense as may have been reasonably incurred by the party wronged on account of the contract"). Thus, by electing rescission, Italian Cowboy did not need to prove that its damages were *caused* by the latent defect; it needed only to prove what amount would restore it to its original position. Italian Cowboy offered detailed expert testimony as to the amount required to make it whole. This is legally sufficient evidence as to the amount of damages Italian Cowboy was entitled to recover alongside rescission of the lease.[18]

■ Prudential also disputes three specific elements constituting a portion of Italian Cowboy's damages. We reject those arguments. First, the trial court concluded that Italian Cowboy was entitled to recover $81,000 based on the time and effort put in by the Secchis because evidence demonstrated that this "investment" was made in lieu of hiring other personnel. *See Tidrow v. Roth,* 189 S.W.3d 408, 411 (Tex.App.-Dallas 2006, no pet.) (observing that trial court had awarded damages for an investor's "time and effort"); *cf. Weav-*

---

18. Again, we offer no opinion as to whether a tenant might elect instead to ratify the lease upon a breach of the implied warranty of suitability, and if so, whether it might be able to recover any damages; or whether a tenant might recover any damages incurred before a landlord repairs the latent defect. *Cf. Dallas Farm Mach. Co. v. Reaves,* 158 Tex. 1, 307 S.W.2d 233, 238–39 (1957) ("[I]t is well settled that one who is induced by fraud to enter into a contract has his choice of remedies.

'He may stand to the bargain and recover damages for the fraud, or he may rescind the contract, and return the thing bought, and receive back what he paid.' " (quoting *Blythe v. Speake,* 23 Tex. 429, 436 (1859))). *But cf. Fortune Prod. Co. v. Conoco, Inc.,* 52 S.W.3d 671, 677 (Tex.2000) (discussing the "intricacies of the remedies for fraud" and observing that "a party may affirm a contract that has been induced by fraud in such a way that damages are foreclosed.").

*er v. Jock,* 717 S.W.2d 654, 661 (Tex.App.-Waco 1986, writ ref'd n.r.e.) (affirming damages for services and labor expended in performance of a contract). Prudential offers no authority as to why this award was improper. Certainly a business owner's time and effort have value, and we see no reason why the trial court could not measure that value against the cost of hiring someone else instead. Accordingly, we are unwilling to strike this portion of Italian Cowboy's damages.

■ Prudential next argues that Italian Cowboy is not entitled to recover damages for accounts payable—$94,512.47 of the total damages calculation—because there is "no evidence that any of the creditors is seeking payment." But in this situation, where damages are proper in order to retire debt that would not have otherwise existed, we conclude that the burden is properly on Prudential to demonstrate that any such debts have been excused. Prudential points to no such evidence.

■ Finally, Italian Cowboy is entitled to recover the trial court's award of $27,505 for interest carry. The record shows that this figure represents what Italian Cowboy's damages expert called "an investment pay back calculation," which we take to mean the interest that Italian Cowboy's investors—the Secchis— would have earned on their investment had they made it elsewhere. Prudential suggests that this amounts to a double recovery because such "payment of interest would have been made from Italian Cowboy's assets," and therefore such interest was already "included in the difference between Italian Cowboy's initial assets and its assets when the restaurant closed." The logic of this position escapes us. Italian Cowboy could not have both paid interest or dividends from its assets and kept that money as an asset, which was a de-

duction in the trial court's calculation, not a credit as Prudential seems to suggest. More to the point, Prudential points to nothing indicating that the money invested in Italian Cowboy could not have earned interest elsewhere, or that its investors already received such payments.

We thus conclude that Italian Cowboy established its actual damages for breach of the implied warranty of suitability by legally sufficient evidence. Because Prudential also challenges the factual sufficiency of these damages, on remand, the court of appeals should consider any such remaining issues as to Italian Cowboy's rescission damages.

## VI. Conclusion

We reverse the court of appeals' judgment and render judgment in favor of Italian Cowboy on its claim for rescission premised on Prudential's breach of the implied warranty of suitability. We remand the case to the court of appeals for additional consideration consistent with this Court's opinion.

Justice HECHT filed a dissenting opinion, in which Justice WILLETT and Justice GUZMAN joined.

Justice HECHT, joined by Justice WILLETT and Justice GUZMAN, dissenting.

Francesco and Jane Secchi owned and operated two successful Dallas-area restaurants. Italian Cowboy was to be the third. To find just the right location, they secured a broker, conducted demographic studies, examined restaurant reports by the Texas Alcoholic Beverage Commission, and viewed many potential sites. They learned that a restaurant was closing in the Keystone Park Shopping Center, an area they liked. They had eaten at other restaurants in the shopping center, and

they found out those restaurants were operating profitably. They met with the landlord's agent, and for five months, assisted by their attorney, they negotiated a lease. In the meantime, they inspected the property repeatedly, sometimes with the agent present and sometimes by themselves. The lease went through seven drafts. The Secchis had been in the res- The lease stated:

> Tenant acknowledges that neither Landlord nor Landlord's agents, employees or contractors have made any representations or promises with respect to the Site, the Shopping Center or this lease except as expressly set forth herein.

Each statement is a statement of *fact*, like "the sun is shining" or "the sky is blue". In the lease, Italian Cowboy stated that Prudential and Prizm *did not make* representations other than those contained in the lease. In the petition, Italian Cowboy stated that Prudential and Prizm *did make* representations, representations that were not contained in the lease. Both statements cannot be true. Either representations not contained in the lease were made, or they were not made.

The Secchis knew full well whether the statement in the lease was true when they made it. They were Italian Cowboy's only representatives. They do not claim to have been mistaken—that representations made by Prudential and Prizm were supposed to have been included in the lease but were inadvertently omitted by mistake. They do not claim to have been tricked—that important provisions were surreptitiously removed from the lease before Francesco signed it. The Secchis do not contend that after studying seven drafts of the lease with their lawyer, they just forgot to include representations that Prudential and Prizm had made about the suitability of the site for use as a restaurant. They do not plead that they were

taurant business twenty-five years. This was not their first rodeo.

On October 18, 2000, Francesco Secchi signed a lease on behalf of the tenant, Italian Cowboy Partners, Ltd. Not quite nine months later, on July 12, 2001, the Secchis sued the landlord, Prudential Insurance Co., and its agent, Prizm Partners. The petition stated:

> Italian Cowboy Partners and the Secchis reasonably and detrimentally relied on the representations of Prudential and Prizm that the Premises were suitable for use as a restaurant and were a prime restaurant site.

only rubes duped into stating something that was not true. The lease stated the facts as the Secchis knew them to be: representations not included in the lease were not made.

And that is exactly what Frances Fox Powell, the person who dealt with the Secchis for Prudential and Prizm, testified to at trial. The Secchis testified, contrary to the lease, that Powell had told them the building was "problem-free", that previous tenants had "no problems" with the building, and that it was a "perfect building". Asked at trial whether she had told the Secchis "that the building was in perfect condition", she answered, "No." Had she made "any misrepresentations concerning the condition of the building?" "No." Had "a sewer gas odor ever [been] pointed out ... or mentioned ... as being present" by the general manager of the restaurant that had vacated the premises before Italian Cowboy leased them? "No." Powell testified that the Secchis' first mention of an unpleasant odor was in February 2001. She testified:

> Q At any time prior to the closing of the restaurant permanently and the filing of this lawsuit, did either Mr. or Mrs. Secchi ever come to you and say,

"Mrs. Powell, you failed to tell us something about this restaurant that was significant", or "there was something about this restaurant that you told us that proved to be contrary". Did that ever take place?

A No.

Q In December, January, February, March, April, May, June up through July, did Mr. and Mrs. Secchi and you have any conversation where it was suggested to you that you had made a statement to them that had proven to be untrue?

A No.

Q Or that you failed to disclose something to them?

A No.

Had she concealed anything she knew about the premises from the Secchis? "No." Had she deceived them in any of her dealings with them? "No." Had she "always [been] truthful with them"? "Yes."

Of course, as the Court notes, Powell's testimony was rejected by the trial court, as reflected in its findings of fact and judgment. But the issue is not whether Powell was truthful or whether there is evidence to support the judgment. Powell's testimony cannot be ignored because it establishes that the parties now dispute *a fact*—what representations were made— about which they unquestionably agreed at the time they inked the lease. The issue is whether the law allows a sophisticated party in a commercial transaction, represented by counsel, with full knowledge of all the circumstances, without mistake or duress of any kind, to include in a contract a statement of fact that is important to the other party, and later disavow it as having been false at the time it was made. Italian Cowboy and the Secchis can prevail on

their fraud claim only if they successfully defrauded Prudential and Prizm. Can a party claim fraud based on his own fraud?

The Court ignores this issue and presents instead the question "whether the lease agreement disclaims reliance on representations made by Prudential, negating an element of Italian Cowboy's fraud claim." [1] Since the lease says absolutely nothing about reliance, this is a pretty easy question to answer, and the Court's poor strawman does not put up much of a struggle before being demolished. As the Court observes, the law has long been skeptical of a party's agreement, sometimes referred to generally as a merger clause, not to rely on statements made by the other party outside the contract. Experience teaches that people are often not as serious as they should be in agreeing to such provisions. That, the Court concludes, is the situation we have here. Italian Cowboy intended nothing by its statement in the lease other than a merger clause; merger clauses often use similar language; merger clauses do not effectively disclaim reliance; and therefore, Italian Cowboy's statement does not disclaim reliance.

At the risk of appearing a stickler, I think what matters is the statement Italian Cowboy made, not what it may have intended would result. Even if intent were important in this situation, one cannot say the word "none" and intend by it to mean the word "some". In the Court's view, by stating that Prudential and Prizm had not "made any representations", Italian Cowboy either meant the exact opposite—that Prudential and Prizm had made *some* representations—or it meant nothing at all.

The principal authority on which the Court relies is our 1957 decision in *Dallas*

1. *Ante* at 331.

*Farm Machinery Co. v. Reaves,*[2] so its facts are worth recounting. Reaves traded in his two Ford tractors and loaders for a new Oliver tractor and loader on the strength of a salesman's representations that the new equipment would do a better job faster.[3] After trying out the new machinery for 45 minutes, Reaves concluded it was worthless and the representations were false.[4] He demanded the return of his old equipment. Dallas Farm Machinery refused and sued for the balance due on the contract.[5] The contract was a one-page form with a provision on the back warranting that the goods sold were "well made and of good material", agreeing to replace defective parts for six months, and stating: "This warranty is made in lieu of all other warranties, express or implied, and no warranty is made or authorized to be made other than herein set forth."[6] The Court held that this provision did not preclude Reaves's counterclaim for rescission based on fraudulent inducement.[7] The Court did not suggest that Reaves was familiar with the capabilities of the equipment he bought—on the contrary, it was his lack of familiarity with the Oliver equipment that led to his complaints—or that the contract was negotiated, or that he was represented by counsel.

*Reaves* recognizes the reality that parties do not always pay attention to contractual provisions or recognize their consequences. But in three cases since—

*Prudential Insurance Co. of America v. Jefferson Associates, Ltd.,*[8] *Schlumberger Technology Corp. v. Swanson,*[9] and *Forest Oil Corp. v. McAllen*[10]—we have refused to apply *Reaves* absolutely when sophisticated parties represented by legal counsel negotiate commercial agreements. The Court acknowledges that the *Reaves* rule has exceptions, but only if parties choose clear and unequivocal language and disclaim reliance on representations rather than the existence of representations. The contracts in *Schlumberger* and *Forest Oil* both stated that "no promise or agreement which is not herein expressed has been made",[11] provisions substantively indistinguishable to Italian Cowboy's acknowledgment that neither Prudential nor its agents had "made any representations or promises ... except as expressly set forth" in the lease. But the parties in *Schlumberger* and *Forest Oil* added that they were not "relying upon any statement or representation" of any other party but were instead "relying on [their] own judgment".[12] According to the Court, the contracts in *Schlumberger* and *Forest Oil* precluded fraud claims only because they used the word "relying", which Italian Cowboy's lease did not do.

The requirement that parties use clear and unequivocal language helps ensure that they will understand the import of their contractual statements, so it is surprising that the examples the Court offers

2. 158 Tex. 1, 307 S.W.2d 233 (1957).

3. *Dallas Farm Mach. Co. v. Reaves,* 300 S.W.2d 180, 181 (Tex.Civ.App.-Fort Worth 1957), *aff'd,* 158 Tex. 1, 307 S.W.2d 233 (1957).

4. 300 S.W.2d at 181.

5. *Id.*

6. 307 S.W.2d at 234.

7. *Id.* at 239–241.

8. 896 S.W.2d 156, 161–162 (Tex.1995).

9. 959 S.W.2d 171, 180 (Tex.1997).

10. 268 S.W.3d 51, 58 (Tex.2008).

11. *Forest Oil,* 268 S.W.3d at 54 n. 4; *Schlumberger,* 959 S.W.2d at 180.

12. *Forest Oil,* 268 S.W.3d at 54 n. 4; *Schlumberger,* 959 S.W.2d at 180.

are provisions in which the language is internally inconsistent. The parties in *Schlumberger* and *Forest Oil* agreed that no representations had been made and that they were not relying on ones that had been made. For lawyers accustomed to pleading in the alternative, this may make perfect sense, but someone less flexible might have more trouble understanding how representations were both made and not made. A flat-out averment like Italian Cowboy's, that no representations were made, period, is surely clearer and less equivocal than a statement that representations were not made, or if they were, they were not relied on.

The Court's preference for a disclaimer of reliance over a disclaimer of representations is simply a mystery. According to the Court, a party who states (somewhat equivocally) that although representations may have been made, he is not relying on any of them, should be held to his word and his later claim of fraud foreclosed. But a party who unequivocally denies that any representations were made to induce his agreement, other than those in the agreement itself, may later sue for fraud on representations he denied were ever made. For purposes of forestalling litigation, his denial is essentially void. If the Court has any reason for distinguishing between the two disclaimers, it is nowhere explained.

It may not matter. In a footnote, the Court warns that even "a clear and unequivocal disclaimer of reliance" may not be "binding on the parties involved", depending on "the circumstances".[13] When would such a disclaimer not be binding? According to the Court, whenever the parties have not discussed during their negotiations the substance of the later-alleged misrepresentation—in this case, the unpleasant odor on the premises.[14] But Italian Cowboy, Prudential, and Prizm all claim they knew nothing about the odor before the lease was signed. Since Italian Cowboy had had every opportunity to inspect the premises and discuss their suitability with prior restaurant tenants, the purpose of the disclaimer was to avoid disputes over such matters after the contract was signed. The trial court did not believe Prudential and Prizm, but if it had, the discussion the Court would require to uphold the disclaimer would have been impossible, and the disclaimer would not have precluded the lawsuit. In the Court's view, a clear and equivocal disclaimer of reliance is effective only if no dispute arises after the contract was signed that was not discussed beforehand. Otherwise, the Court gives parties but one choice: litigate.

I would hold Italian Cowboy to the statement it made in the lease when it was completely capable of being accurate, ably counseled, and fully incentivized: "neither Landlord nor Landlord's agents, employees or contractors have made any representations or promises with respect to the Site".[15] Italian Cowboy's recourse should

---

13. *Ante* at 337 n. 8.

14. This is one of several instances cited by the Court in which a disclaimer would not be binding.

15. Apparently confused about the issues in the case, the Court mischaracterizes the dissent and Prudential as arguing that a merger clause excuses parties from "hav[ing] to disclose known defects". *Ante* at 336. This case does not involve an issue of nondisclosure. Italian Cowboy claims that Prudential made affirmative misrepresentations that were fraudulent, not that it failed to disclose information. "Failing to disclose information is equivalent to a false representation only when particular circumstances impose a duty on a party to speak, and the party deliberately remains silent." *In re Int'l Profit Assocs., Inc.* 274 S.W.3d 672, 678 (Tex.2009) (citing *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex.2001),

lie solely in its claim for breach of an implied warranty of suitability. But that claim, too, is precluded by Italian Cowboy's agreement. In the lease, it agreed to "be responsible for all repairs to the interior and non-structural components of the Premises, including but not limited to the interior ..., and all ... ventilating ... systems...." I disagree with the Court that work necessary to remedy the odor in the premises fell outside this responsibility. In fact, the odor was later remedied, by the restaurant-tenant who succeeded Italian Cowboy, by repairs to the interior, including the ventilating systems.

The Court's depreciation of the written word in this case is troubling and exacts a high price, not only to the parties here, but to all who are denied the right to negotiate freedom from uncertain, unending litigation. This case was filed in July 2001, over nine years ago. Were Italian Cowboy bound by its statements in the lease, its fraud claim could have been quickly dismissed, leaving only the warranty claim and the simpler issue of how the lease allocated responsibility for repairing a problem like the odor. The case has already been to this Court once before, with Italian Cowboy arguing unsuccessfully that its agreement to waive a jury was not binding—other words it used and didn't mean.[16] The trial court's judgment, rendered in 2005, awarded Italian Cowboy $650,700.40 in damages and $705,000 attorney fees. With interest, the judgment is well now over $2 million. The case is remanded for its third hearing in the court of appeals. A new trial is still a possibility. The cost and delay are no one's fault; they are simply the price the system exacts for the denial of freedom of contract.

and *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 353 (Tex.1995)). Italian Cowboy does not assert that Prudential was under such a duty in negotiating the lease.

The law should allow willing and able parties to avoid a litigation toll-tax and agree to greater certainty in their dealings. Because today's opinion refuses that opportunity, I respectfully dissent.

16. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 140–141 (Tex.2004).