**Opinion filed October 31, 2013**



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00290-CV

_____

**EAGLE OIL & GAS CO., Appellant**
**V.**
**TRO-X, L.P., Appellee**

**AND**

**TRO-X, L.P., Cross-Appellant**
**V.**
**EAGLE OIL & GAS PARTNERS, LLC, Cross-Appellee**

**On Appeal from the 238th District Court**
**Midland County, Texas**
**Trial Court Cause No.  CV-46,196**

### DISSENTING OPINION

I would hold that the agreement in this case is ambiguous, and I would reverse the judgment of the trial court and remand the case so that the factfinder might first determine the parties' true intent.

The facts and the contents of the agreement are set forth in the majority opinion and need not be repeated here.

TRO-X and Eagle Oil both argue that the New Prospects Agreement is not ambiguous. The majority agrees with them. However, as stated by the majority, a court may decide that an agreement is ambiguous in spite of what the parties argue to the contrary. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 231 (Tex. 2003).

In construing a written contract, our primary objective is to determine the true intentions of the parties as expressed in the writing. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). We are to consider the entire writing "in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker*, 650 S.W.2d at 393. If the written agreement is so worded that it can be assigned a certain or definite legal meaning or interpretation, it is not ambiguous, and a court will construe the agreement as a matter of law. *Id.* A written agreement is, however, ambiguous "when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning." *Id.* Whether an agreement is ambiguous is a question for the court to decide as a matter of law. *Id.* at 394. In making that legal decision, a court examines the agreement as a whole in light of the circumstances attendant when the parties made the contract. *Id.* Although we are to give words their plain meaning, unless some different or technical meaning is designated in the agreement, we must not render any part of the agreement meaningless. *Id. at* 393; *Healthcare Cable Sys., Inc. v. Good Shepherd Hosp., Inc.*, 180 S.W.3d 787, 791 (Tex. App.—Tyler 2005, no pet.).

TRO-X maintains that, although it may have the unilateral right to exercise its right of retention, it was not required to exercise that right until Eagle Oil had consulted with it. TRO-X presents several scenarios in which it describes how

TRO-X might decide its course of action differently under those various scenarios if presented with the full details of each sale. For instance, if "TRO-X felt that a proposed sale was at too low a price, it could elect to retain an unpromoted working interest." "If Eagle [Oil] had a sale that resulted in a large profit, TRO-X could keep its proportionate share of that profit. If, on the other hand, Eagle [Oil] had a sale with [a] very small profit, TRO-X had the right to retain its proportionate share of the acreage instead." Or, TRO-X argues, it could elect a combination.

Eagle Oil takes the position that it was not required to consult with TRO-X before TRO-X was required to choose its retained unpromoted working interest. That right was one that uniquely and unilaterally was held and was to be exercised by TRO-X. Eagle Oil further argues that it would not be in a position to market the other interests if Eagle Oil had no idea of the extent of the interests that it could offer for sale. Potential purchasers would not be interested in pursuing a deal unless they first knew what was actually available to buy. If TRO-X's position is correct, Eagle Oil's argument goes, it would be required to notify TRO-X of the terms of a potential sale, wait on TRO-X to make a decision as to what course of action it wanted to take, and only then be able to tell a purchaser what it could offer for sale.

The meaning of the word "consultation" and its application is not clear in this agreement. The parties might have meant that Eagle Oil only had "to have regard to; consider; to ask the advice or opinion of; [or] to refer to" TRO-X's input because, for one reason, it was largely Eagle Oil's money that had gone toward the purchase of the interests. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 268 (11th ed. 2004) (definition of "consult"). Further, the parties might have included the term in the section with sales because that is all that they intended to happen: to consult before sales but not before retention. Or, the parties might have meant that

3

"consultation" means more than "notice" or more than the dictionary definition of consult set forth above. If TRO-X were to be able to effectively and intelligently consult with Eagle Oil about the terms of any sale and if it were to be able to intelligently choose its retained interest, then it must be made aware of the terms of any potential sale. Otherwise, its right of consultation basically would be meaningless, except to obtain the ear of Eagle Oil—and that perhaps for naught since Eagle Oil had the final say.

To lend further doubt to the parties' true intention is the use of the word "all" in Section II.A. of the agreement. "All" could refer to the fact that TRO-X could no longer retain an interest when there was no interest that remained in the deal against which it could exercise its right of retention. Or, it is reasonable to conclude that "all" could mean "every" as defined in MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 31 (11th ed. 2004).

Further, we cannot ignore the reasonable possibility that the parties could have at least intended that an implied notice provision be read into the agreement in connection with TRO-X's right of retention. Such an implied provision could provide reasonable notice of a potential sale, regardless of what the term "consultation" means or regardless of how it is applied. Otherwise, it would be possible for Eagle Oil to sell "all" working interests in a particular deal without TRO-X ever knowing about it. Such an occurrence without any notice would prevent TRO-X from exercising its right to retain any interest at all in that deal.

I believe that, after applying the rules of interpretation, there are at least two reasonable interpretations of the New Prospects Agreement as set out above and that the meanings and applications of the terms "consultation" and "all" are unclear. Further, it would be reasonable to interpret the agreement in such a way as to provide for reasonable notice by Eagle Oil to TRO-X prior to any sale of all of the interest in a deal. Therefore, I would hold that the New Prospects

4

Agreement is ambiguous and would reverse and remand this case to the trial court so that the factfinder might first determine the true intent of the parties. Like the majority, however, I would not reach the other issues in this appeal, but I would not reach them for the reason that the New Prospects Agreement is ambiguous.


JIM R. WRIGHT

CHIEF JUSTICE


October 31, 2013

Panel consists of: Wright, C.J.,
McCall, J., and Hill.[1]


Willson, J., not participating.

---

[1]John G. Hill, Former Chief Justice, Court of Appeals, 2nd District of Texas at Fort Worth, sitting by assignment.