**Opinion filed September 18, 2014**



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00214-CV

_____

### TRENT WALTON, Appellant

### V.

### MIDLAND MIRA VISTA HOMEOWNERS' ASSOCIATION A/K/A MIRA VISTA HOMEOWNERS' ASSOCIATION, Appellee

**On Appeal from the 142nd District Court**

**Midland County, Texas**

**Trial Court Cause No. CV-46,913**

## MEMORANDUM OPINION

Trent Walton appeals the trial court's order denying his plea to the jurisdiction, the trial court's order denying in part his motion for partial summary judgment, and the trial court's order granting in part the motion for summary judgment of Midland Mira Vista Homeowners' Association a/k/a Mira Vista Homeowners' Association. We affirm.

## I. *Background Facts*

This appeal involves the interpretation of provisions in the "Declaration of Restrictions and Covenants for Mira Vista Subdivision" (the Declaration). The subdivision is a residential subdivision that consists of thirteen lots in Midland. The real property in the subdivision is subject to the Declaration.

This case arose out of disputes between Walton, who is a homeowner in the subdivision, and Midland Mira Vista Homeowners' Association (the HOA), which is a nonprofit corporation. In 2008 and 2009, the HOA levied Maintenance Assessments and Special Assessments against the lots in the subdivision. After Walton failed to pay some of the assessments, the HOA brought suit against him. The HOA alleged in its petition that Walton had failed to pay assessments that he owed on two lots in the subdivision. The HOA sought to recover the amount allegedly owed by Walton and its attorney's fees. The HOA also sought a declaratory judgment that Walton would be liable for assessments on Lot One A (1A) and Lot Two A (2A), Mira Vista, Section 2, in the subdivision for as long as he owned the lots.

Walton answered the HOA's suit and also sought declaratory relief. Walton sought a declaratory judgment that the HOA was not the corporation that was authorized under the Declaration to levy assessments and that, therefore, the HOA did not have authority to levy assessments against the lot owners; that Walton owned only one lot in the subdivision that was subject to the Declaration because the two lots he had purchased had been replatted into one lot; and that the Declaration limited the amount of Maintenance Assessments that could be levied against a single lot to $500 per year. Walton also filed a plea to the jurisdiction. In the plea, Walton asserted that the HOA lacked standing to bring suit against him based on his contention that the HOA was not the proper party under the Declaration to levy assessments.

2

The HOA filed a traditional motion for summary judgment. In its motion, the HOA sought a declaratory judgment to the effect (1) that it was authorized under the Declaration to levy Maintenance Assessments and Special Assessments, (2) that it had authority to levy assessments against Walton's lots, (3) that Walton's property constituted two lots under the Declaration, and (4) that Walton had failed to pay assessments that he owed under the Declaration. The HOA asserted that Walton owed $5,705.36 in past due assessments, and it sought judgment for that amount. The HOA also moved for summary judgment on its claim for attorney's fees. Walton filed a competing traditional motion for partial summary judgment in which he moved for summary judgment on his claims for declaratory relief.

The trial court heard Walton's plea to the jurisdiction and the parties' competing motions for summary judgment. Following the hearing, the trial court concluded that the HOA had standing to maintain the suit; therefore, the trial court entered an order denying Walton's plea to the jurisdiction. The trial court also entered separate orders on the competing motions for summary judgment. The trial court granted Walton's motion in part and denied the remainder of the motion. The trial court entered the following orders as to Walton's motion:

> IT IS ORDERED, ADJUDGED AND DECREED that as to [Walton's] issue regarding the authority of [the HOA] to exercise the powers and authority vested in "Mira Vista Homeowners' Association" under the Declaration, [Walton's] Motion for Partial Summary Judgment is denied.

> IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that as to [Walton's] issue that [the HOA] may not levy assessments in excess of $500 per lot per year, [Walton's] Motion for Partial Summary Judgment is granted as it relates to the Maintenance Assessments for 2008 and 2009 and the Special Assessment for 2008 which were levied by [the HOA], but [Walton's] Motion for Partial Summary Judgment is denied as it relates to the Special Assessments for 2009 which were levied by [the HOA].

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that as to [Walton's] issue that [Walton] owns only one (1) lot in the Mira Vista Subdivision, [Walton's] Motion for Partial Summary Judgment is denied and [Walton's] property, consisting of two (2) lots, may be levied with an assessment (Maintenance, Special or Individual, as applicable) for each lot.

IT IS ORDERED, ADJUDGED, AND DECREED that as to [Walton's] issues not specifically mentioned or granted herein, [Walton's] Motion for Partial Summary Judgment is denied.

The trial court granted in part the HOA's motion for summary judgment. The trial court entered the following orders, among others, as to the HOA's motion:

IT IS ORDERED, ADJUDGED, AND DECREED that as to [the HOA's] issue that [the HOA] is a proper non-profit corporation authorized under the Declaration to levy Maintenance and Special Assessments, [the HOA's] Motion for Summary Judgment is granted.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that as to [the HOA's] issue that [the HOA] had the authority to levy assessments against [Walton's] lots, [the HOA's] Motion for Summary Judgment is granted.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that as to [the HOA's] issue that [Walton's] property constitutes two lots under the Declaration, [the HOA's] Motion for Summary Judgment is granted.

The trial court awarded the HOA damages for past due assessments in the amount of $4,233.16. This amount represented Maintenance Assessments for 2008 in the amount of $1,000 ($500 per lot for two lots), Maintenance Assessments for 2009 in the amount of $1,000 ($500 per lot for two lots), and Special Assessments for 2009 in the amount of $2,233.16. The 2009 Special Assessments consisted of landscaping for $1,552.14 ($776.07 per lot for two lots), irrigation repair for

4

$161.02 ($80.51 per lot for two lots), and tree pruning for $520 ($260 per lot for two lots). The trial court also awarded the HOA its attorney's fees in the sum of $3,000 through the proceedings in the trial court and conditional appellate attorney's fees.

The trial court also ordered that the HOA's motion for summary judgment was denied as to all of the HOA's issues that were not specifically mentioned or granted in the order. As stated above, the HOA sought to recover assessments totaling $5,705.36. The trial court awarded $4,233.16 of this amount. The trial court did not include $1,472.20 of the requested amount in its award. The $1,472.20 amount consisted of additional 2008 and 2009 Maintenance Assessments, a 2008 Special Assessment for sprinkler system repairs, and a 2009 Special Assessment for legal fees.

## II. *Analysis*

Walton presents four issues for review. In his first issue, Walton asserts that the HOA was not a proper homeowners' association for the subdivision because the HOA was not created as a homeowners' association in accordance with the Declaration. Based on this assertion, Walton contends that the trial court erred by entering a declaratory judgment that the HOA was authorized under the Declaration to levy assessments. In his second issue, Walton contends that the HOA lacked standing to bring suit against him for unpaid assessments because it did not have the authority to levy the assessments. Therefore, Walton asserts that the trial court erred by denying his plea to the jurisdiction. In his third issue, Walton contends that the trial court erred by entering a declaratory judgment that his property constitutes two lots, and not a single lot, under the Declaration, for the purpose of levying assessments. In his fourth issue, Walton contends that the trial court erred by granting summary judgment that he owed any Special Assessments

5

because the Special Assessments in question were not approved in the manner required by the Declaration.

### A. Standard of Review

Standing is a component of subject-matter jurisdiction, and we review the issue of standing de novo. *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 646 (Tex. 2004). Standing exists if the party bringing the suit is personally aggrieved by the alleged wrong. *Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996). In reviewing the standing issue, we construe the petition in favor of the HOA and review the entire record to determine whether any evidence supports standing. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993).

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). The movant for traditional summary judgment must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). When competing motions for summary judgment are filed and one is granted and the other denied, the reviewing court must review the summary judgment evidence presented by both sides, determine all questions presented, and render such judgment as the trial court should have rendered. *Comm'rs Court of Titus Cnty. v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997).

### B. Interpretation of Declaration

We must construe the Declaration according to the general rules that apply to the construction of contracts. *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998); *Epernay Cmty. Ass'n, Inc. v. Shaar*, 349 S.W.3d 738, 742 (Tex. App.—Houston [14th Dist.] 2011, no pet.). In construing a contract, our primary objective is to ascertain and give effect to the true intentions of the parties as

6

expressed in the contract. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). In identifying such intent, we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that no provision will be rendered meaningless. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). If the written agreement is so worded that it can be assigned a certain or definite legal meaning or interpretation, it is not ambiguous, and a court will construe the agreement as a matter of law. *Id.* In this case, neither party asserts that the Declaration is ambiguous, and we conclude that the Declaration can be assigned a certain definite legal meaning and that it is not, therefore, ambiguous.

### 1. The Declaration

The record shows that G.W. Allen and Gina Lucchi Allen were the developers of the subdivision. They executed the Declaration for the subdivision in 1997. The Allens stated in the Declaration that they were making "the following declarations as to the limitations, restrictions and uses that may be placed on all and/or any portion of the property comprising the Subdivision." In the Declaration, the Allens specified that "these declarations shall constitute covenants to run with all of said land as provided by law, shall be binding upon the undersigned and all persons claiming under them, and shall be for the benefit of and shall constitute limitations upon all future owners and other parties or persons claiming any interest therein."

### 2. Definitions in Declaration

Article I of the Declaration is a definitions section. It contains numerous pertinent definitions:

(1) "Developer" shall mean and refer to G.W. Allen and Gina Lucchi Allen, their heirs, personal representatives, and assigns, who

7

are the persons or entities responsible for the platting and development of the Subdivision.

(2) "Plat" shall mean and refer to any recorded plat or replat of the Subdivision, as filed in the Plat Records of Midland County, Texas.

(3) "Lot(s)" shall mean and refer to any numbered tract or parcel of land shown by the Subdivision's Plat and upon which residential single family homes and appurtenances may be built.

(4) "Lot Owner" shall mean and refer to the record owner, whether one or more persons, firms or corporations, of the fee simple title to the surface of any Lot within the Subdivision. . . .

(5) "Common Areas" shall mean and refer to those areas designated as Common Areas A, B, and C on attached Exhibit A which are reserved for the common use, enjoyment and mutual benefit of the Lot Owners, their guests and invitees.

. . . .

(7) "Mira Vista Homeowners' Association" hereinafter sometimes referred to as the "Association," shall mean and refer to a non-profit incorporated association of all Lot Owners. Each Lot Owner shall be a member of the Mira Vista Homeowners' Association. The principal purpose of the Association is to maintain and provide common community facilities and services for the Common Areas for the common use and enjoyment of all Lot Owners, their guests and invitees.

*3. Creation of Homeowners' Association*

Article II of the Declaration is titled "MIRA VISTA HOMEOWNERS' ASSOCIATION." Section 2.01 of the Declaration provides as follows:

Section 2.01 **Formation and Purpose.** Developer shall create a non-profit corporation under the laws of the State of Texas, to be known as the "Mira Vista Homeowners' Association" that shall have the power and obligation of perpetually managing, maintaining,

8

repairing, replacing, improving and insuring the Common Areas. In exercising this authority and performing these obligations, the Association shall collect assessments, make disbursements of proceeds, and take appropriate disciplinary action concerning delinquent accounts as hereinafter provided in this Declaration.

Section 2.02 provides that "[e]ach Lot Owner shall automatically become a member of the Association."

### 4. *Common Areas*

Article VI of the Declaration relates to the Common Areas of the subdivision. Section 6.01 provides that "[t]he Common Areas are reserved for the common private use, recreation, enjoyment, mutual benefit and open space uses of all Lot Owners and residents, their guests and invitees, for recreation and open space uses." Under Section 6.01, "[t]he Common Areas include, but are not limited to, landscaped areas, irrigation, lighting, signage, sidewalks, screening, and fencing devices." Section 6.02 provides that "Developer shall retain title to the Common Areas until (a) Developer shall have sold at least seventy-five percent (75%) of the Lots to third parties (other than by transfer in bulk) or (b) December 31, 2002, whichever shall occur earlier," and that, "[u]pon the earlier of these two events, Developer shall convey free of charge the fee simple title to the surface estate in the Common Areas to the Association." Section 6.02 also provides that, during the time that the Developer retains title to the Common Areas, "the Association shall be responsible for the maintenance and upkeep of the Common Areas at all times following the recordation of this Declaration."

### 5. *Assessments*

Article VII of the Declaration, relates to assessments. Article VII provides in relevant part as follows:

Section 7.01. **Covenant and Lien for Assessments.** Developer, for each Lot owned by it, and each Lot Owner, by

acceptance of a deed, shall be deemed to and does hereby covenant and agree, to pay to the Association: (a) regular assessments or charges (the "Maintenance Assessment"), (b) special assessment[s] for capital improvements or unusual or emergency matters (the "Special Assessment"), and (c) individual special assessments (the "Individual Assessment") as hereinafter provided in this Article. . . .

Section 7.02 **Purpose of Assessments.** The assessments levied by the Association shall be used exclusively for the purpose of promoting the recreation, health, safety and welfare of the residents of the Lots and, in particular, for the improvement and maintenance of the Common Areas and related facilities devoted to this purpose, including, but not limited to, the maintenance, upkeep, repair, replacement, and improvement thereof and the payment of all taxes and insurance attributable thereto.

Section 7.03 relates to Maintenance Assessments. It provides that "the Association shall establish and declare an annual Maintenance Assessment upon each Lot in the Subdivision." Section 7.03 further provides that the "Maintenance Assessment shall be $500.00 per lot per year."

Section 7.04 relates to Special Assessments. It provides that "[t]he Association may levy and charge in any calendar year a Special Assessment, applicable to that year only, for the purpose of defraying, in whole or in part, the cost of any construction, reconstruction, repair, or replacement of a capital improvement upon the Common Areas." Section 7.04 further provides that "[a]ny such Special Assessment shall have the assent of not less than two-thirds (2/3) of the votes of the Lot Owners who are voting in person or by proxy at a meeting of the Association duly called for this purpose."

*C. Authority to Levy Assessments under the Declaration*

Walton asserts in his first and second issues that the HOA did not have the authority under the Declaration to levy assessments against the homeowners in the subdivision. In his brief, Walton states that "[t]he clear and unambiguous language

of the Declaration vests homeowner-association authority in a nonprofit corporation to be created by Developers, G.W. Allen and Gina Lucchi Allen and called 'Mira Vista Homeowners' Association,' not a nonprofit corporation created by [a] lot owner [and] called '*Midland* Mira Vista Homeowners' Association'" (emphasis added). Walton contends that, because the HOA was not the homeowners' association that was actually named in the Declaration, the HOA is a "stranger" to the Declaration and is not entitled to levy assessments against him. We disagree.

The Declaration required the Allens, as the "Developer," to create a nonprofit corporation "to be known as the 'Mira Vista Homeowners' Association.'" Under the Declaration, the Allens, as the "Developer," were obligated to convey "fee simple title to the surface estate of the Common Areas to the Association" by December 31, 2002, at the latest. The provisions of the Declaration show that the Allens, as the Developer, intended to create a homeowners' association that would consist of all the lot owners and that would operate for the mutual benefit of the lot owners and for the other purposes expressed in the Declaration.

The HOA filed the affidavit of Scott Dufford in support of its motion for summary judgment. Dufford owned a lot in the Mira Vista Subdivision. Dufford testified in his affidavit that he was the president of the "Midland Mira Vista Homeowners' Association," a nonprofit corporation that was incorporated in February 2008. Dufford explained how the HOA came into existence. He said that, in late 2007, he learned that the Allens had not formed the homeowners' association called for in the Declaration. Dufford said that he and other lot owners in the subdivision undertook an effort to establish a homeowners' association. Dufford contacted an attorney for help in the process of setting up the homeowners' association. The attorney confirmed that a homeowners' association

11

had not been formed. With the attorney's assistance, Dufford and the other lot owners attempted to use the name "Mira Vista Homeowners' Association" for the nonprofit corporation. However, they learned from the Secretary of State's office that the name "Mira Vista Homeowners' Association" was not available. Therefore, the lot owners named the association the "Midland Mira Vista Homeowners' Association," and they began operating the HOA in the early part of 2008.

After the HOA was incorporated, the Allens executed a warranty deed in which they, as the Developer, conveyed title to the Common Areas of the subdivision to the HOA. The Allens stated in the warranty deed that "[t]he Grantee, herein, is the 'Association' as that term is defined in the Restrictions." Dufford stated in his affidavit that he requested his attorney to send G.W. Allen, as the Developer, an invoice for the legal work performed in connection with forming the HOA and transferring title to the Common Areas from the Developer to the HOA. G.W. Allen paid the invoice at the HOA's request. The HOA filed an assumed name certificate that indicated it would be conducting business under the assumed name, "Mira Vista Homeowners' Association."

The Declaration defines "Mira Vista Homeowners' Association" to mean "a non-profit incorporated association of all Lot Owners." Section 2.01 of the Declaration obligated the Developer to create a nonprofit corporation "*to be known as* the 'Mira Vista Homeowners' Association'" (emphasis added). The language in the Declaration does not show that the Developer intended to limit itself to the use of "Mira Vista Homeowners' Association" for the name of the nonprofit incorporated homeowners' association. The use of the phrase "to be known as" does not show that the Developer intended to impose a requirement that the homeowners' association be named "Mira Vista Homeowners' Association" or nothing else. The Developer did not include language in the Declaration to the

effect that the homeowners' association "shall be named," "must be named," "must be called," or "must be incorporated using the name" the "Mira Vista Homeowners' Association."

If a homeowners' association did not come into existence, the Developer's intentions as expressed in the Declaration would be frustrated, and many provisions in the Declaration would be rendered meaningless. For example, the Declaration provided that the homeowners' association would have the power and obligation to maintain and improve the common areas in the subdivision. Thus, the creation of a homeowners' association was necessary to effectuate the Developer's intent. The HOA is a nonprofit incorporated association of the lot owners in the subdivision. Considering the Declaration in its entirety and the intentions of the Developer as expressed therein, we conclude that the Declaration did not require the homeowners' association to be named the "Mira Vista Homeowners' Association."

Walton also contends that the HOA is not a proper homeowners' association under the Declaration because it was not created by the Developer. As Walton states in his brief, the Developer was required under the Declaration to create the homeowners' association. In this regard, the summary judgment evidence showed that the Developer did not initially fulfill its obligation. However, the Developer executed the Declaration for the benefit of all the lot owners. Dufford and other lot owners undertook the Developer's obligation when they created the HOA. By creating the HOA, the lot owners merely effectuated the Developer's intent. As noted previously, the Developer conveyed title to the common areas to the HOA after it was incorporated. The Developer expressly stated in the deed that "[t]he [HOA] is the 'Association' as that term is defined in the Restrictions." Furthermore, the Developer paid for the expenses related to the formation of the HOA and for the conveyance of the common areas to the HOA. Accordingly, the

Developer's actions show that it agreed with the creation of the HOA as the homeowners' association for this subdivision.

Walton states in his brief that a fundamental question of law in this case is "whether or not [the HOA] may step into and enforce contractual rights vested in the name of a different nonprofit corporation." However, this appeal does not involve that question. The Declaration could not vest any rights in "Mira Vista Homeowners' Association" *as the governing homeowners' association for this subdivision* because it did not exist when the Declaration became effective.

Walton also cites *Gillebaard v. Bayview Acres Ass'n*, 263 S.W.3d 342 (Tex. App.—Houston [1st Dist.] 2007, pet. denied), in support of his contentions. In that case, the deed restrictions for a subdivision did not provide for the creation of a property owners' association. *Gillebaard*, 263 S.W.3d at 344–45. The court held that a property owners' association could not conduct activities on behalf of the homeowners unless the restrictions were first amended to allow for the creation of an association. *Id.* at 350. *Gillebaard* is distinguishable from this case. Unlike the restrictions in *Gillebaard*, the Declaration in this case expressly provided for the creation of a homeowners' association for the subdivision.

The summary judgment evidence established that the HOA was a proper homeowners' association under the Declaration and that, as such, it had the authority to levy assessments against lots in the subdivision. Because the HOA is the authorized homeowners' association for the subdivision, the HOA has standing to maintain a suit for unpaid assessments. Therefore, the trial court did not err by granting summary judgment that the HOA is authorized under the Declaration to levy assessments and by denying Walton's plea to the jurisdiction. Walton's first and second issues are overruled.

14

*D. Walton's Property in the Subdivision*

In his third issue, Walton contends that the trial court erred by entering summary judgment that his property in the subdivision constitutes two lots, and not a single lot, under the Declaration. The summary judgment evidence showed that Walton purchased two lots in the subdivision. Walton presented as summary judgment evidence copies of the deeds that he received when he acquired the lots. One of the deeds showed that, on May 26, 2006, Walton acquired "Lot Two A (2A), Block One (1), Mira Vista, Section 2, . . . according to the map or plat thereof of record in Cabinet F, Page 149, Plat Records, Midland County, Texas." The other deed showed that, on June 7, 2007, Walton acquired "Lot One A (1A), Block One (1), Mira Vista, Section 2, . . . according to the map or plat thereof of record in Plat Cabinet F, Page 149, Plat Records of Midland County, Texas." Both of Walton's lots were subject to the Declaration. Under Section 7.01 of the Declaration, Walton, by acceptance of the deeds to the lots, agreed to pay assessments to the homeowners' association with respect to his lots.

In October 2007, Walton filed an application with the City of Midland to replat his two lots—Lots 1A and 2A—into a single lot. The City approved his request, and the lots were replatted as a single lot known as "Lot 1B, Mira Vista, Section 3." The replat was recorded in the Plat Records of Midland County. Based on the City's replat of the lots, Walton asserts that he is responsible to pay assessments for only one lot under the Declaration.

The HOA asserts that a lot owner, such as Walton, cannot avoid the obligation under the Declaration to pay assessments on multiple lots by unilaterally replatting the lots into a single lot. We agree. The definition of "Developer" in the Declaration provides that the "Developer" and its heirs, personal representatives, and assigns "are the persons or entities responsible for the platting and

development of the Subdivision." Thus, the intent of the Developer was that it, and not the individual lot owners, could seek to replat property in the subdivision. In Article VII, the parties contemplated that the lot owners would share in the payment of assessments on a "per lot" basis. If a lot owner could avoid his or her payment of assessments on a lot by unilaterally replatting two lots into one lot, the purpose of Article VII would be frustrated. Considering the intent of the parties as expressed in the Declaration, we conclude that Walton could not avoid his obligation to pay assessments on two lots by having his lots replatted into one lot. Walton's third issue is overruled.

*E. Special Assessments for 2009*

The HOA sought to recover Special Assessments that it had levied in 2008 and 2009. The trial court granted summary judgment to Walton on the HOA's claim for the 2008 Special Assessments. The trial court granted summary judgment to the HOA for past due Special Assessments in the amount of $2,233.16 for 2009. The HOA also sought to recover $177.98 per lot in legal fees that it had levied as a special assessment in 2009. The trial court did not include this amount in its award of Special Assessments to the HOA.

Walton contends in his fourth issue that the trial court erred by granting summary judgment that he owed $2,233.16 in Special Assessments for 2009. Under Section 7.04, Special Assessments may be levied "for the purpose of defraying, in whole or in part, the cost of any construction, reconstruction, repair, or replacement of a capital improvement upon the Common Areas." Section 7.04 provides that "[a]ny such Special Assessment shall have the assent of not less than two-thirds (2/3) of the votes of the Lot Owners who are voting in person or by proxy at a meeting of the Association duly called for this purpose."

Walton asserts that the 2009 Special Assessments were improper because they were not approved at a meeting as required by the Declaration. The summary

16

judgment evidence showed that the HOA levied the 2009 Special Assessments before it called a meeting of its lot owners in an effort to attain their assent to the special assessments. However, the HOA presented evidence that it called a special meeting of all of its members, who were lot owners in the subdivision, to be held on December 31, 2009, and that one of the items that would be considered and voted on at the meeting would be to "Approve Special Assessments for the year 2009." The HOA held the meeting on December 31, 2009. The minutes of the special meeting show that the lot owners voted to approve the Special Assessments for 2009, with Walton abstaining from the vote. Thus, the summary judgment evidence showed that, as required by Section 7.04 of the Declaration, the lot owners assented to the HOA's action in levying the Special Assessments for 2009. Based on the summary judgment evidence, we conclude that the trial court did not err by granting summary judgment to the HOA that Walton owed it past-due Special Assessments in the amount of $2,233.16. Walton's fourth issue is overruled.

III. <em>This Court's Ruling</em>

We affirm the orders of the trial court.

JOHN M. BAILEY<br>JUSTICE

September 18, 2014

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.