**Affirmed and Opinion Filed July 28, 2021**



In The

## Court of Appeals
### Fifth District of Texas at Dallas

### No. 05-19-01295-CV

### GEORGE H. CLEMENTS, III, Appellant
### V.
### HLF FUNDING, Appellee

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-08411**

## MEMORANDUM OPINION

Before Justices Molberg, Reichek, and Nowell
Opinion by Justice Nowell

George H. Clements, III appeals from a judgment awarding damages to HLF

Funding (HLF) for fraud. Following a nonjury trial, the trial court found Clements,

Jacob Verghese, and their company, Prime Sands, LLC, committed fraud against

HLF in connection with a Loan and Royalty Purchase Agreement between HLF and

Prime Sands. Only Clements appeals. He argues the evidence is legally and factually

insufficient to support the judgment and HLF failed to plead and prove that the

alleged fraud was committed primarily for Clements's personal benefit under

business organizations code section 21.223(a), (b). We conclude the evidence is

sufficient to support the judgment and section 21.223 does not apply. We affirm the trial court's judgment.

## Background

This case involves two transactions between HLF and Prime Sands. In the first, HLF loaned $30,000 to Prime Sands, which Prime Sands was able to repay with interest. In the second transaction, HLF loaned $650,000 to Prime Sands, but the transaction failed and is the subject of the fraud claim.

HLF is a general partnership whose members are lawyers in the Hartnett Law Firm. Jim Hartnett is the managing partner of HLF. Clements was a political consultant for Will Hartnett, also a member of HLF, for several years.

In 2014, Clements and Verghese formed Prime Sands to sell "frac sand" used in oil and gas drilling operations. They were members and co-managers of Prime Sands. Clements approached Will Hartnett about investing in or lending money to Prime Sands. Clements and Verghese were interested in a letter of credit to secure a lease for railcars needed to transport the sand. On October 8, 2014, Verghese emailed Will Hartnett about rail logistics, stating they had secured forty railcars and needed to obtain engine power for the first trip. The next day, HLF agreed to lend Prime Sands $30,000, due in 75 days at 15% interest together with a royalty of $1 per ton from sand shipments. Prime Sands signed the promissory note on October 10, 2014.

Prime Sands learned soon afterwards that it would not be able to ship the sand as anticipated. But Verghese told the Hartnetts that Prime Sands had been able to

gross $200,000 on a sublease of the railcars. Prime Sands paid the $30,000 promissory note to HLF with interest.

In December 2014, Prime Sands approached HLF about a $900,000 letter of credit to secure a lease of railcars in exchange for a perpetual royalty of $1 per ton of sand shipped. The parties continued discussing the transaction over the next several months. At some point, the structure changed from a letter of credit to a loan and royalty. During this time, Prime Sands was also in discussions with a company known as PDI for an investment of $12 million in Prime Sands.

On April 29, 2015, Verghese emailed Will Hartnett about a favorable offer he received to lease railcars for three years at a low rate. To secure the lease, Prime Sands would need to pay six months up front at the rate of $540 per car for a total investment of $638,280. Hartnett asked what specific investment he was seeking from HLF. On May 4, 2015, Verghese responded with a spreadsheet showing a draw schedule for $648,000 for the railcar lease and stated that this amount would be paid back within ninety days at 10% per annum plus the royalty of $1 per ton of sand. As with most of his emails, Verghese copied Clements on the email.

Verghese and Clements engaged in several telephone calls and meetings with the Hartnetts about the potential loan. They told HLF that the loan would be safe because Prime Sands could sublease the railcars if it was unable to transport sand, referencing the earlier transaction where Prime Sands was able to sublease the railcars and repay the $30,000 loan.

–3–

On May 6, 2015, Jim Hartnett emailed Clements with several questions about the proposed deal. He asked what would happen if the $12 million investment did not materialize, when the $650,000 loan from HLF would be due, and whether it would be paid with the proceeds from use of the railcars or from the investor funds. Hartnett asked how HLF would be protected by subleasing the railcars and how the $650,000 loan amount was calculated.

On May 7, 2015, Verghese sent an email to Clements responding to Hartnett's questions. Clements forwarded the email to Hartnett. The email explained that:

- Prime Sands would be paying up front for four months of a lease of 197 railcars at the rate of $540 per car ($425,520 total);
- $106,380 would remain in the account for auto-draft by the lessor for the fifth month of the lease;
- The remaining $116,380 would be used for moving the railcars to the mine in Wisconsin;
- "The main reason we need this investment from the Hartnett group is because obtaining the rail cars is on a tight schedule";
- If the $12 million investment does not come through "it will not have a direct impact on the business model" as it would be used to secure larger contracts; and
- If Prime Sands could not use the railcars, it could sublease them to "many different clients."

On May 11, 2015, Jim Hartnett sent an email to Verghese and Clements outlining specific terms for a $650,000 loan to be repaid within one year with interest. In return for the loan, HLF would receive a royalty of $1 per ton of sand for an unlimited time. The interest rate would vary based on whether Prime Sands met a royalty target during each quarter, and if Prime Sands received an investment of at

–4–

least $8 million during the year, the loan would be repaid within ten days of receipt of the investment. Verghese sent a draft agreement to Hartnett on May 12, informing him that, "We have to sign the lease today for the rail cars." The parties signed the Loan and Royalty Purchase Agreement (Agreement) on May 13, 2015. HLF transferred the funds on May 15, 2015.

The Agreement recites that Prime Sands intends to sell "frac sand" for a profit and HLF wishes to lend operating capital to Prime Sands and purchase a royalty interest. HLF agreed to transfer $650,000 to Prime Sands as both a loan and as consideration for the Royalty Interest defined in the Agreement. The Agreement contains a merger clause stating it is the final agreement with respect to the subject matter and "no additional terms or modification or alteration of this Agreement shall be valid unless the same is specified in writing and signed by [HLF] and the [Prime Sands]." The Agreement provides that the loan is also consideration for the Royalty Interest, which is defined as entitling HLF to be paid "$1 for each short ton ('2000 pounds') of Sand sold by the [Prime Sands] for so long as [Prime Sands] sells Sand." The Agreement also states that no representations upon which HLF was relying were made in connection with the offering of the Royalty Interest other than as set forth in the agreement, HLF is an accredited investor able to bear the substantial risks of investing in the Royalty Interest, HLF recognizes that Prime Sands is a start-up company with no financial and operating history, and in making its investment

decision, HLF "has relied solely on its own advisors, and not on the advice of the [Prime Sands] or the [Prime Sand]'s legal counsel."

While negotiating the loan and royalty agreement with HLF, and without HLF's knowledge, Prime Sands was also negotiating a deal with Domino Sand Services, LLC to provide processing for barite. Barite is a mineral used in drilling operations that could be sold to drilling companies. On May 11, 2015, Prime Sands signed an agreement with Domino to process raw barite transported by barge to Domino's plant near Houston. Before receiving the loan from HLF, Prime Sands committed to paying $250,000 to Domino as a down payment for the processing agreement. HLF wired the loan funds to Prime Sands on May 15, 2015. Later that day, Prime Sands used part of the loan to pay the $250,000 to Domino. Ultimately, Prime Sands's buyer, May-Cat Logistics, was unable to purchase the barite and Prime Sands was unable to recover the $250,000 from Domino.

After making the loan, HLF contacted Prime Sands for updates on the lease of the railcars and shipment of sand. On May 22, 2015, Verghese emailed Jim Hartnett and Clements stating that "getting these rail cars have been a game changer." He stated they had spoken with the rail lessor to begin the process of moving the cars to the mine and expected the first sand deal in mid to late June. In fact, Prime Sands had not paid any money in advance for leasing the railcars and, when it did pay for leasing railcars at the end of June 2015, the lease was only for two months. Verghese admitted at trial that Prime Sands "never caused the railcars

to be moved anywhere." Despite repeated assurances from Prime Sands that the railcars were about to be moved to the mine and that orders were in process and would be shipped, no sand was ever transported by Prime Sands. HLF's inquiries about whether the railcars were being subleased were not answered. In addition, PDI never funded the $12 million investment. Without the investment from PDI, Verghese and Clements were unable to buy, sell, and transport sand because buyers demanded sixty-day to ninety-day payment terms, which Prime Sands could not finance. Prime Sands was unable to repay the loan when it matured in May 2016.

HLF eventually learned that Prime Sands had used the loan proceeds for salaries to Verghese and Clements, attorney expenses, insurance, office expenses, and the $250,000 deposit to Domino. Only about $107,000 was used to secure the rights to railcars for two months.

HLF sued Prime Sands for breach of the Agreement and fraud, and Verghese and Clements for fraud. Following a nonjury trial, the trial court rendered judgment in favor of HLF against Prime Sands, Verghese, and Clements for fraud and awarded actual damages of $650,000. The parties filed pretrial proposed findings of fact and conclusions of law but did not request them after trial. The trial court did not file findings of fact and conclusions of law. Clements's motion to modify the judgment and for new trial was overruled by operation of law. Only Clements appeals.

**Standard of Review**

In a nonjury trial, when neither party requests findings of fact and conclusions of law, all fact findings necessary to support the trial court's judgment are implied. *Sixth RMA Partners, LP v. Sibley*, 111 S.W.3d 46, 52 (Tex. 2003); *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992). The trial judge's decision will be sustained on any reasonable theory consistent with the evidence and the applicable law, considering only the evidence favorable to the decision. *See Holt Atherton*, 835 S.W.2d at 83; *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam); *In re W.E.R.*, 669 S.W.2d 716, 717 (Tex. 1984) (per curiam). When a reporter's record is filed on appeal, the implied findings may be challenged for legal and factual insufficiency. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017); *Holt Atherton*, 835 S.W.2d at 83.

In evaluating the legal sufficiency of the evidence to support a finding, we credit favorable evidence if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally sufficient if it is more than a "scintilla" of evidence on which a reasonable factfinder could find the fact to be true. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 613 (Tex. 2016). In reviewing the factual sufficiency of the evidence, we review all the evidence and will set aside the finding only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and

unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). In a bench trial, the trial court is the sole judge of the credibility of the witnesses and may believe one witness over another and resolve any conflicts or inconsistencies in the testimony. *Shaw v. County of Dallas*, 251 S.W.3d 165, 169 (Tex. App.—Dallas 2008, pet. denied); *Sanders v. Total Heat & Air, Inc.*, 248 S.W.3d 907, 917–18 (Tex. App.— Dallas 2008, no pet.).

A plaintiff seeking to prevail on a fraud claim must prove that (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 217 (Tex. 2011).

**Analysis**

**A. Sufficiency of the Evidence**

In his first and third issues, Clements asserts the evidence is legally and factually insufficient to support the judgment. Clements argues there is no evidence he made a material misrepresentation to HLF. He argues that because the Agreement was not of the same type as contemplated by defendants there is no evidence they

–9–

induced HLF to enter into that contract. According to Clements, they originally contemplated a letter of credit then a ninety-day loan. He contends HLF's proposal for a one-year loan was a totally different transaction and precludes HLF's fraud claim. We disagree.

The theory Clements references applies where the defendant makes representations that a third party attempts to rely upon, such as when investors claim to have relied on an audit report issued to a corporation. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 574–75 (Tex. 2001) (holding accounting firm not liable to investors because it had no reason to expect the investor's reliance on the audit report). Here, however, the misrepresentations were made directly to HLF and both Verghese and Clements admitted they intended HLF to rely on the representations in the May 7 email. Thus, the reason-to-expect standard of *Ernst & Young* does not apply. But even if it did, that standard does not require that the transaction be identical to the one the defendant contemplates. *Id*. at 580. Rather, the transaction "must have the same essential character: 'it may differ in matters of detail or in extent, unless these differences are so great as to amount to a change in the essential character of the transaction.'" *Id*. (quoting RESTATEMENT (SECOND) OF TORTS § 531 cmt. g). Although the parties had discussed a letter of credit in January 2015, on May 4, Prime Sands proposed a $648,000 loan to be paid back with ten percent interest in ninety days with a $1 per ton royalty on sand. The parties ultimately agreed to a one-year loan for $650,000 with a varying interest rate and

the same royalty. The length of the loan and the interest rate were merely matters of detail or extent and did not change the essential character of the transaction.

### 1. Material Representations

Clements argues he did not make a material misrepresentation of fact to HLF. However, there is evidence in the record to support the trial court's implied finding that he did. Jim Hartnett asked Clements several specific questions about the proposed transaction on May 6, 2015. Clements forwarded those questions to Verghese, who replied to Clements on May 7. Clements reviewed the response, thought it "looked reasonable," and then forwarded the response to HLF intending they should rely on it. By doing so, Clements adopted Verghese's responses as his own.

The May 7 email is evidence of representations that:

- The loan from HLF was needed to secure the first five months of a lease of railcars and to pay the cost of transferring the cars;
- All of the money would be used for the lease and move of the railcars;
- If the investment from PDI did not come through, it would not directly impact Prime Sands's business model because that investment would merely "speed up and secure larger contracts"; and
- If Prime Sands was unable to use the railcars to transport sand, they could be subleased for other purposes.

In addition, the evidence indicates Clements participated in several meetings and phone conversations with the Hartnetts about leasing the railcars and the possibility of subleasing them. Clements agreed that HLF was told that all the money

–11–

was to be paid in advance on the lease of the railcars, with the possibility of subleasing the railcars as downside protection.

Clements contends his statements to HLF about Prime Sands's business plan and future prospects were merely opinion. Generally, pure expressions of opinion are not representations of material fact and cannot be a basis for fraud. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337–38 (Tex. 2011). "Whether a statement is an actionable statement of 'fact' or merely one of 'opinion' often depends on the circumstances in which a statement is made." *Id.* (quoting *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995)). Special or one-sided knowledge may help lead to the conclusion that a statement is one of fact, not opinion. *See id.* A statement of opinion may be actionable if: (1) it is "intertwined" with "direct representations of present facts;" (2) "the speaker has knowledge of its falsity;" (3) it is "based on past or present facts;" or (4) the speaker has "special knowledge of facts that will occur or exist in the future." *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930–31 (Tex. 1983). "Superior knowledge by one party may also provide the occasion for fraud." *Italian Cowboy*, 341 S.W.3d at 338 (quoting *Faircloth*, 898 S.W.2d at 277).

"When a speaker purports to have special knowledge of the facts, or does have superior knowledge of the facts—for example, when the facts underlying the opinion are not equally available to both parties—a party may maintain a fraud action." *Matis v. Golden*, 228 S.W.3d 301, 307 (Tex. App.—Waco 2007, no pet.) (quoting *Paull v.*

–12–

*Capital Res. Mgmt., Inc.*, 987 S.W.2d 214, 219 (Tex. App.—Austin 1999, pet. denied)), *disapproved on other grounds by Bonsmara Nat. Beef Co., LLC v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d 385 (Tex. 2020).

Clements argues on appeal he never represented that all the loan proceeds would be used to lease railcars, but he admitted at trial that HLF was told all the money would be paid in advance on the lease of the railcars. He represented that the loan would be protected by the possibility of subleasing the railcars. For there to be protection of the loan through subleasing, there had to be a lease to begin with. He forwarded Verghese's May 7 email to HLF in direct response to questions about how the loan amount was determined and how the loan would be repaid. The email states:

> We will be paying for the first 4 months of lease up front at the rate of $540 per car ($425,520 total) which includes commissions and maintenance for all cars. A total of $106,380 for one month of lease rate will be left in the account for auto draft by the lessor for the 5th month. The remaining $116,380 will be used to pay for the empty rail cars to be moved from the storage/ shop to the mine in Blair, Wisconsin.

This is evidence Clements made the representation.

There is evidence Clements and Verghese had specialized knowledge of what would be necessary to secure the favorable rates for leasing the railcars. Clements as co-manager and the person in charge of finding investors, had access to information not available to HLF. Considering the circumstances in which the statements were made, the record supports that the statements were factual and, to

–13–

the extent they were opinion, based on specialized knowledge. *See Matis*, 228 S.W.3d at 307–08. Based on the evidence before it, the trial court could reasonably find that the representations were actionable.

There is also evidence in the record that the representations in the May 7 email were material. Both Jim and Will Hartnett testified they would not have made the loan without the representation the money would be used for the lease of railcars. Jim Hartnett testified HLF would not have made the loan if they had known the funds would be used for general overhead of Prime Sands. He testified that he knew Prime Sands was looking for a large investor but based on the representations from Clements and Verghese he believed repayment of the loan was not contingent on obtaining the outside investor.

"Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *Italian Cowboy*, 341 S.W.3d at 337 (quoting *Smith v. KNC Optical, Inc.*, 296 S.W.3d 807, 812 (Tex. App.—Dallas 2009, no pet.)). There is evidence HLF would not have made the loan without the representations. Clements admitted he never discussed the possibility the loan would be used for anything other than the rail lease. Given the prior transaction and the negotiations between the parties over several months, all centering on the leasing of railcars to transport sand, a reasonable person would attach importance and act on the representations about how the loan would be used, downside protection, and the impact of not obtaining

–14–

an outside investor. We conclude there is evidence supporting the finding that the representations were material.

## 2. Recklessness

Clements argues there is no evidence he made the representations knowing they were false or made them recklessly without knowledge of the truth. He contends he believed the representations when he made them. HLF counters that there is ample evidence Clements recklessly made the representations without knowing the truth.

A party acts recklessly if he makes representations "without any knowledge of the truth and as a positive assertion." *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992). A representation is recklessly made if the speaker knows that he does not have sufficient information or basis to support it, *Trenholm*, 646 S.W.2d at 933, or if he realizes that he does not know whether or not the statement is true. *Custom Leasing, Inc. v. Texas Bank & Trust Co.*, 516 S.W.2d 138, 142 (Tex. 1974). Because intent to defraud is not susceptible to direct proof, "it invariably must be proven by circumstantial evidence." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986). "Fraud is usually not discernible by direct evidence and is usually so covert or attendant with such attempts at concealment as to be incapable of proof other than by circumstantial evidence." *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 707 (Tex. App.—Fort Worth 2006, pet. denied). "While a party's intent is determined at the time the party made the

representation, it may be inferred from the party's subsequent acts after the representation is made." *Spoljaric*, 708 S.W.2d at 434. Intent is a fact question "uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Id*.

As discussed above, there is evidence Clements represented that all of HLF's loan would be used for leasing and transporting the railcars. Clements admitted the payment to Domino was inconsistent with the representations made to HLF. Although he denied knowing about the payment to Domino before the loan was made, Clements admitted he knew a transaction was being made from a phone conversation with Verghese. Clements testified he was in charge of finding investors for Prime Sands. There is evidence that at the time of the loan, Prime Sands had only one other investor, who had invested $100,000. The trial court could reasonably conclude that without the HLF loan there were insufficient funds in the company to make the $250,000 payment to Domino. This is evidence Clements was reckless in representing that all the funds would be used for the rail lease.

Clements represented that the loan would be protected by the ability to sublease railcars. Clements contends the loan was not tied to the railcars, but in that event the representation that the loan would be protected by the ability to sublease the railcars was false or made recklessly. Without obtaining the lease in the first place, Clements's representation of downside protection through subleasing was

recklessly misleading. Without the lease of railcars, there would be no cars to sublease.

Clements also testified he did not know some of the loan proceeds would be used to pay his salary and other business expenses. He thought all the HLF money would be safe in an account. However, he later testified that the loan funds could be used for any business purpose, including salaries and overhead expenses.

It was up to the trial court to resolve the inconsistencies in the testimony and make credibility determinations. *Spoljaric*, 708 S.W.2d at 435. We conclude there is evidence supporting the implied finding that representations that the loan funds would be used to secure the rail lease and the railcars could be subleased were made recklessly.

There is also evidence Clements was reckless in representing that Prime Sands's business model would not be impacted by the failure to obtain the PDI investment. Verghese testified, "we had no way of moving forward without that investment money . . .." At trial, Clements equivocated about the impact of failing to get the PDI investment:

> "Yes and no. I mean, there was a — I thought that we could go get some deals closed, create some revenues and kind of get up and running that way. But it certainly would have made it much faster if we had had the infusion of capital.

Clements was a co-manager with Verghese and responsible for obtaining investors. There is evidence that other than the HLF loan, Prime Sands had one

investor who invested $100,000. Even if it still held some funds from the transaction in 2014, there is evidence Prime Sands lacked the capital to finance its business model of buying and selling sand without the PDI investment. The trial court could reasonably conclude the representation that Prime Sands did not need the additional investment from PDI was made recklessly. *See Matis*, 228 S.W.3d at 309–10 (stating trial court could reasonably conclude defendants did not understand investment's process and acted recklessly by misinforming plaintiffs regarding the investment's terms).

### 3. Justifiable Reliance

Clements argues there is no evidence HLF justifiably relied on Clements's representations based on the merger clause and the investor representations in the Agreement. He also contends HLF failed to exercise ordinary care to protect its own interests.

Initially, Clements contends clear and unequivocal language in the Agreement expressly disclaims reliance on representations not included in the Agreement. *See Italian Cowboy*, 341 S.W.3d at 332 (recognizing that when "sophisticated parties represented by counsel disclaim reliance on representations about a specific matter in dispute, such a disclaimer may be binding, conclusively negating the element of reliance in a suit for fraudulent inducement") (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997)); *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 60–61 (Tex. 2008) (applying *Schlumberger* analysis to settlement

agreement intended to resolve both future and past claims). However, Clements did not plead express disclaimer as an affirmative defense. *MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 136 (Tex. 2014) (holding defense of disclaimer "is one of avoidance, rather than a defense in denial"); *Samedan Oil Corp. v. Intrastate Gas Gathering, Inc.*, 78 S.W.3d 425, 441 (Tex. App.—Tyler 2001, pet. granted, judgm't vacated w.r.m.) (holding disclaimer of reliance is affirmative defense to fraud claim); *see also Shoemake v. Fogel, Ltd.*, 826 S.W.2d 933, 937 (Tex. 1992) ("Generally, an affirmative defense is waived if it is not pleaded.").

Further, a standard merger clause like that in the Agreement[1] is insufficient to expressly disclaim reliance. *Italian Cowboy*, 341 S.W.3d at 331–32. The investor representations in paragraph 15 of the Agreement apply by their terms to the offering of the Royalty Interest,[2] not representations about the loan. HLF's fraud claim is

---

[1] **Entire Agreement; Modification**. This Agreement is the final agreement with respect to the subject matter hereof, and no additional terms or modification or alteration of this Agreement shall be valid unless the same is specified in writing and signed by Investor and the Company.

[2] **Investor Representations**. The Investor hereby represents and warrants to the Company as follows:

(a) The Investor acknowledges that all documents and other materials pertaining to this investment that the Investor has requested to examine have been made available for inspection by the Investor. The Investor, or a person or persons acting on the Investor's behalf, has had a reasonable opportunity to ask questions of and receive answers from the Company concerning *the offering of the Royalty Interest* and all such questions have been answered to the full satisfaction of the Investor. No representations (oral or otherwise) upon which the Investor is relying have been made to the Investor *in connection with the offering of the Royalty Interest* other than as set forth herein.

. . . .

(h) The Investor has carefully considered and has, to the extent it believes such discussion necessary, discussed with its professional legal, tax and financial advisors, *the suitability of investing in the Royalty Interest* for its particular tax and financial situation, and the Investor has determined that the Royalty Interest are a suitable investment for it. In making

based on representations about the loan rather than the royalty interest. Therefore, we limit our discussion to whether there is sufficient evidence that HLF justifiably relied on the misrepresentations. *See JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 n.1 (Tex. 2018) (noting distinction between contractual terms that negate justifiable reliance and "*Italian Cowboy*-type contractual clauses that expressly waive fraud causes of action").

To prevail on a fraud claim, a plaintiff must show actual and justifiable reliance. *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 554 (Tex. 2019). Whether reliance is justifiable is normally a fact question, but the element may be negated as a matter of law when circumstances exist under which reliance cannot be justified. *Id.* at 558. In determining whether justifiable reliance is negated as a matter of law, courts must consider the nature of the parties' relationship and the contract. *See Orca Assets*, 546 S.W.3d at 658. Reliance may not be justified where the representations are directly contradicted by the terms of the contract between the parties or where there are "red flags" indicating such reliance is unwarranted. *Id.*; *see also Carduco*, 583 S.W.3d at 559 ("Although *Orca Assets* discusses both direct contradiction and other red flags, it does not require them both to negate justifiable reliance."); *Orca Assets*, 546 S.W.3d at 660 n.2.

---

its investment decision, the Investor has relied solely on its own advisors, and not on the advice of the Company or the Company's legal counsel.

(emphasis added).

"In an arm's-length transaction[,] the defrauded party must exercise ordinary care for the protection of his own interests. . .. [A] failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party." *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 425 (Tex. 2015) (per curiam) (quoting *Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962)). *But see Koral Indus. v. Sec.-Connecticut Life Ins. Co.*, 802 S.W.2d 650, 651 (Tex. 1990) (per curiam) ("Failure to use due diligence to suspect or discover someone's fraud will not act to bar the defense of fraud to the contract."); *Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex. 1983) ("Where one has been induced to enter into a contract by fraudulent representations, the person committing the fraud cannot defeat a claim for damages based upon a plea that the party defrauded might have discovered the truth by the exercise of proper care.") (quoting *Isenhower v. Bell*, 365 S.W.2d 354, 357 (Tex. 1963)); *Labbe v. Corbett*, 6 S.W. 808, 811–12 (Tex. 1888).

Clements contends there is a direct contradiction between the representations and the Agreement because the representations are not specifically mentioned in the Agreement. But the silence of the Agreement on the use of the funds, the possibility of subleasing the railcars, and the impact of the loss of the PDI investment, does not directly and unambiguously contradict the representations. *See Carduco*, 583 S.W.3d at 559 (stating reliance on misrepresentation "that the written contract directly and unambiguously contradicts" is red flag indicating reliance is not justified). Put simply, silence is not direct contradiction. A reasonable person could

–21–

read the Agreement and still plausibly claim to believe the representations. *See Orca Assets*, 546 S.W.3d at 659.

Clements points to the recital in the Agreement that HLF desired to lend operating capital to the company and argues that operating capital can be used for any business purpose. However, use of the loan for leasing railcars is not inconsistent with the recital of the intent to lend operating capital. The purpose of Prime Sands was to sell sand for a profit. In order to accomplish that purpose, Prime Sands would have to buy sand from producers then transport and sell it to its buyers. Prime Sands sought to secure favorable leasing rates for the railcars needed to transport the sand from the suppliers to the ultimate buyers. Operating capital for the business would certainly include the expense of securing rail transportation for the sand. The operating capital HLF loaned was to secure the five-month lease of railcars.

Clements argues other red flags indicate that HLF's reliance was not justified. He argues he had no history of starting and operating a successful business other than political consulting, and Prime Sands had no history of success in selling sand and failed to sell sand in 2014. Although HLF knew Prime Sands had not been able to sell sand in 2014, Prime Sands was successful at leasing railcars with the $30,000 loan from HLF and used those railcars to generate revenue used to repay the loan. The lack of a history of success may have raised concerns that Prime Sands might not be successful, but that lack of history does not indicate the representation that the loan would be used to acquire five months of a rail lease was unreliable.

Clements contends it was a red flag that Prime Sands was undercapitalized and needed a substantial outside investment to operate. The record indicates Jim Hartnett knew Prime Sands had some money, but not enough to "do what they needed to do." He also knew they needed the railcars to sell sand for a profit. It is also true that HLF knew Prime Sands was attempting to obtain a substantial investment from PDI. Indeed, HLF specifically asked, "What happens if your 12,000,000 investor doesn't come through/how does that effect your business model?" Clements and Verghese responded that the PDI investment would be needed secure the sand and lock in low rates, but if the investment did not come through, "it will not have a direct impact on the business model" and was only to be used to "speed up and secure larger contracts." Thus, even if Prime Sands's capitalization was a warning about the representations, HLF "did the only thing [it] could do to investigate," it asked Clements how the lack of the investment would impact the business model. *See Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 812 (5th Cir. 2017) (holding there was genuine fact issue whether plaintiff's reliance on defendant's representations was justified).

Next, Clements argues that Will Hartnett did not believe that Prime Sands could sublease the railcars for a profit and knew that subleasing was subject to market conditions and would not eliminate the downside risk. While HLF did not believe the railcars could be subleased *for a profit*, that does not raise a red flag that the railcars could not be subleased at all and generate revenue to make payments on

–23–

the loan. And it certainly does not indicate the representation that the loan would be used to lease the railcars in the first instance was unreliable.

We cannot say on this record that, as a matter of law, reliance was not justified. Thus, whether reliance was justified was a fact question for the trial court to determine. Because there is evidence to support the trial court's implied finding that HLF's reliance was justified, we will not disturb that finding.

### 4. Summary

Based on the record in this case, we conclude there is legally sufficient evidence to support the trial court's implied findings. Considering all the evidence, we conclude the evidence is not so weak as to make the trial court's findings clearly wrong or unjust.

We overrule Clements's first and third issues.

## B. Business Organizations Code

In his second issue, Clements argues there is legally insufficient evidence because HLF did not plead or prove that Clements committed fraud "primarily for [his] direct personal benefit," as required by business organizations code section 21.223(a), (b). TEX. BUS. ORGS. CODE § 21.223(a), (b).

Section 21.223(a)(2) provides in relevant part that a shareholder of a corporation may not be held liable to the corporation's obligees with respect to

> any contractual obligation of the corporation or any matter relating to
> or arising from the obligation on the basis that the holder, beneficial
> owner, subscriber, or affiliate is or was the alter ego of the corporation

> or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory.

*Id*. § 21.223(a)(2). Subsection (b) provides that subsection (a)(2) does not prevent or limit the liability of a shareholder if the obligee demonstrates that the shareholder "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit" of the shareholder. *Id*. § 21.223(b).

HLF is not seeking hold Clements liable for a contractual obligation of the corporation. It seeks to hold Clements liable for his own fraudulent conduct. "Agents are personally liable for their own torts." *Miller v. Keyser*, 90 S.W.3d 712, 716-17 (Tex. 2002) (recognizing Texas' longstanding rule that a corporate agent is personally liable for his own fraudulent or tortious acts); *see also Walker v. Anderson*, 232 S.W.3d 899, 918 (Tex. App.—Dallas 2007, no pet.). Because a corporate agent is liable for his own torts, it is not necessary to pierce the corporate veil to find liability. *Walker*, 232 S.W.3d at 918; *Kingston v. Helm*, 82 S.W.3d 755, 759, 765–67 (Tex. App.—Corpus Christi–Edinburg 2002, pet. denied). This claim does not fall within the purview of section 21.223, so a finding that Clements used the corporation to perpetuate fraud for his direct personal benefit is not required.

## Conclusion

Because legally and factually sufficient evidence supports the trial court's findings of fraud and section 21.223 does not apply, we overrule Clements's issues and affirm the trial court's judgment.

/Erin A. Nowell/
ERIN A. NOWELL
JUSTICE

191295F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

GEORGE H. CLEMENTS, III,
Appellant

No. 05-19-01295-CV     V.

HLF FUNDING, Appellee

On Appeal from the 134th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-17-08411.
Opinion delivered by Justice Nowell.
Justices Molberg and Reichek
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee HLF Funding recover its costs of this appeal from appellant George H. Clements, III.

Judgment entered July 28, 2021